[No. B095241. Second Dist., Div. Seven. Mar. 4, 1998.]

LINDEN PARTNERS et al., Plaintiffs and Respondents, v.
WILSHIRE LINDEN ASSOCIATES et al., Defendants and Appellants.

**COUNSEL**

Fischbach & Fischbach and Joseph S. Fischbach for Defendants and Appellants.

Sullivan, Workman & Dee and Joseph S. Dzida for Plaintiff and Respondent.

**OPINION**

**SIMPSON, J.\***—

### FACTS AND PROCEDURAL BACKGROUND

On June 7, 1989, plaintiffs agreed to buy and defendants agreed to sell a medical office building in Beverly Hills, known as the Wilshire-Linden Building. An agreement was signed on that date. The initial purchase price was $22.2 million. Escrow was opened on June 13, 1989, and after several negotiated extensions, closed on October 27, 1989.

The defendants had owned the building since the early 1980's. Each of the tenants had a written lease with, and paid rent directly to defendants—with one important exception; there was a subtenant on the premises—and apparently only one—named Bank Leumi (hereafter Leumi).

Leumi leased space on the ground floor from its sublessor, Wells Fargo Bank (hereinafter Wells Fargo) and paid its rent directly to Wells Fargo, which, in turn, paid its rent to defendants. Wells Fargo had been a tenant for many years. Defendants had no direct dealings with Leumi and had no reason to be concerned, on a day-to-day basis, with the amount of rent being paid by Leumi to Wells Fargo.

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Plaintiffs, on the other hand, had reason to be concerned with all rents being paid on the premises, because the economic viability of the building and, hence, its fair market value was dependent, first and foremost, upon rental income.

Under the agreement, defendants were required to deliver to plaintiffs certain specified documents, including all existing leases and a "rent roll" listing all tenants, suite numbers, rent being paid, expiration dates of each lease, and other information giving an overview of the rental situation.

Defendants immediately undertook the performance of that obligation and, with the exception of the one lapse in performance which was the genesis of this litigation, carried out its terms fully and faithfully.

When plaintiffs received these documents, they began without delay reading and making sure they understood all terms and conditions. To assist them in this task, plaintiffs hired a team of specialists—brokers, an attorney and others. Defendants never failed to make themselves available to answer questions or provide available supplementary material.

At the same time, plaintiffs began an inspection of every nook and cranny of the building; a condition to plaintiffs' obligations was their approval of the physical condition of the property within 45 days from the opening of escrow.

The agreement also obligated the defendants to furnish to plaintiffs, but not until the close of escrow, so-called estoppel certificates to be signed by each tenant attesting to the space occupied, the date of the current lease, the length of the terms, the amount of current monthly rent, and other information which would serve as a relatively full disclosure of the terms and conditions of the landlord/tenant relationship between defendants (as landlord) and the tenants. A further condition to plaintiffs' obligations under the agreement was the approval of estoppel certificates signed by at least 75 percent of the tenants and dated not more than 20 days before close of escrow. Defendants agreed to provide an estoppel certificate signed by defendants for the balance of the tenants. Early in the process of gathering up these estoppel certificates defendants learned that Leumi was refusing to sign such a certificate. Leumi's response to a request to sign was that it was not required by their lease with Wells Fargo, and they were simply not going to sign anything not contractually required.

The first willowy puffs of a storm cloud appeared when Wells Fargo also refused to sign an estoppel certificate for its subtenant.

The amount of rent being paid by Leumi to Wells Fargo took on a measure of unanticipated importance in the early stages of document and property inspection. Only a month into the escrow period, defendants broached to plaintiffs an idea that defendants had only talked about: a buy-out of the Wells Fargo lease. Defendants suggested to plaintiffs that if Wells Fargo were bought off, the space occupied by Wells Fargo could be leased for higher rent. The idea brought to the fore and underscored the importance of knowing how much rent Leumi was paying. Defendants had furnished plaintiffs copies of the Wells Fargo lease and the Wells Fargo-Leumi sublease, but those documents did not state the amount of Leumi's rent. There was not a word about the amount of Leumi's rent in the Wells Fargo lease, and in the sublease there was a paragraph which stated an amount of base rental and then described the methodology for calculating the total rental: That calculation required adding to the base rental a pro rata share of the building's operating expenses attributable to Wells Fargo using calendar year 1982 as a base year. The key figure in the computation—the amount of operating expenses attributable to Wells Fargo to which the Leumi pro rata share was to be applied—was not shown.

On or about July 12, 1989, the parties held a meeting to discuss the Wells Fargo buy-out. At that meeting plaintiffs asked defendants how to calculate Leumi's rent. One of the defendants present at the meeting responded and described how to make the calculation: Plaintiffs followed defendants' directions and calculated Leumi's monthly rental to be $9,327.61 per month. The storm clouds were gathering.

Fast forward: On or about the day escrow was to close, defendants put an estoppel certificate for Leumi into escrow, showing monthly rental for Leumi in the amount of $9,327.61.

Escrow closed. Plaintiffs were now Leumi's landlord. Apparently nobody told Leumi because it continued making its rent payments to Wells Fargo. Plaintiffs inquired and finally received their first rent check from Leumi three months after close of escrow: It was for the amount $6,177.60. The storm clouds spilled their fury.

Both parties had made the same mistake: They had applied the figure for Leumi's pro rata share of operating expenses to the amount of such expenses attributable to Wells Fargo dating back to the base year of 1972, instead of the much smaller amount of such expenses dating back only to 1982, as provided by the sublease.

Plaintiffs immediately brought the error to the attention of defendants and demanded that defendants make up the difference. Defendants refused and this lawsuit ensued.

Jury trial commenced on March 20, 1995. Plaintiffs alleged causes of action for intentional and negligent misrepresentation, breach of written contract and money had and received. The jury found for defendants on the fraud and money claims and for the plaintiffs on the claim of breach of contract, awarding them damages in the amount of $131,000 plus interest.

This timely appeal by defendants followed.

### DISCUSSION

Defendants have presented several issues on appeal, giving each a letter designation. They will be addressed in turn.

A. *Did the trial court err in treating plaintiffs' motion for summary adjudication as having been granted by a judge in another department as to an issue of duty, when in fact such motion for summary adjudication had been denied?*

This issue on appeal, as stated by the defendants, does not go to the merits of the issue of duty, one of the issues presented by plaintiffs' motion for summary adjudication. The issue, as stated, only poses the narrow question whether the law and motion judge (hereinafter the first judge) granted or denied the motion regarding duty. A brief review of the facts will explain the conundrum, and the answer will be equally narrow.

On August 4, 1994, plaintiffs filed a notice of motion for summary adjudication of issues, presenting three issues for ruling. The first issue asked for a ruling that defendants had a duty to deliver to plaintiffs an "estoppel certificate" that correctly stated the current monthly rent being paid by Leumi; the second issue asked the court to declare the difference in the amounts of Leumi's rent actually being paid and as represented by defendants, and the third issue requested judgment for plaintiffs on the breach of contract cause of action.

Based upon full briefing and oral argument, the first judge entered an "Order Denying Summary Adjudication." The order contained a brief recital of the relevant facts, a statement of each of the three issues, the ruling as to each issue and the reasons for the rulings. The court ruled that the first issue, regarding defendants' duty, was granted and that the second and third issues were denied. The bases of the court's rulings were clear and unequivocal: Issue one was granted because all relevant facts were undisputed; issue two was denied because there appeared to be triable issues of material fact; and the third issue was denied because judgment could not be granted unless and until the second issue had been resolved in plaintiffs' favor.

This issue on appeal arises from the fact that the first judge mistitled the order. Instead of "Order Denying Summary Adjudication," the order could have been styled "Motion for Summary Adjudication—Granted in part and Denied in part"—or any such title indicating the differences in the rulings.

It could not be seriously argued that the ruling on the first issue—standing alone—was to grant the motion. To hold otherwise because the court's order was mistitled would be to exalt form over substance. Code of Civil Procedure section 1046 provides in relevant part that ". . . (a) paper . . . with a defective title is as valid and effectual for any purpose as if duly entitled. . . ." It would be reasonable to suppose that the plaintiffs could have had the title of this order corrected nunc pro tunc. (Code Civ. Proc., § 1046.) Their failure to attempt.to do so will not vitiate the legal effect of the first judge's ruling which declared that defendants had a contractual duty to deliver a correct estoppel certificate as to Leumi. (See *In re McGrew* (1920) 183 Cal. 177 [190 P. 804].)

The answer to this issue on appeal is: No, the trial judge did not err by treating plaintiffs' motion for summary adjudication regarding the issue of duty as having been granted by the first judge.

B. *Did the first judge's ruling "dispose" of an "issue of duty" as required under Code of Civil Procedure section 437c, subdivision (f)?*

This issue presents for resolution on the merits the question whether the first judge's ruling on the issue of duty was correct.

Code of Civil Procedure section 437c, subdivision (f) provides as follows: "(f)(1) A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims of damages, or one or more issues of duty, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages or an issue of duty." An analysis of whether the first judge properly ruled on the "issue of duty" requires that both the statement of the issue and the ruling be set out verbatim.

The issue presented by plaintiffs read:

"Defendant Wilshire Linden Associates Limited Partnership (hereinafter "Seller") had a duty to deliver to plaintiffs in October 1989 prior to close of

escrow on the sale of the property at 9735 Wilshire Boulevard, Los Angeles, California (hereinafter "the Property") an Estoppel Certificate that correctly stated the then current monthly rent for Bank Leumi." The issue as stated by the court in its order was: "Did (defendants) have a duty to deliver an 'estoppel certificate' which correctly stated the current monthly rent from Bank Leumi?"

The court answered the question as follows: "Defendants have answered "Undisputed" to each of Plaintiffs Undisputed Facts 1 through 7. Defendants statement, in response to Issue 1, that the estoppel certificates were actually provided to Mass Mutual is irrelevant. Issue 1 is GRANTED."

Defendants argue on appeal that the first judge's ruling on the issue of duty was improper as a matter of law for basically two reasons: (1) the issue of duty, as determined by the first judge to exist in this case, is not the kind of "issue of duty" contemplated by Code of Civil Procedure section 437c, subdivision (f); and (2) the ruling did not dispose of an entire cause of action or defense, nor did it dispose of any portion of the action with its determination of an issue of duty.

In support of these arguments, defendants rely principally upon *Regan Roofing Co.* v. *Superior Court* (1994) 24 Cal.App.4th 425 [29 Cal.Rptr.2d 413]. For reasons which we shall discuss, we conclude that such reliance is misplaced.

*Regan* was a petition for writ of mandate brought to challenge the order of the trial court summarily adjudicating issues of duty in the cross-action, which was a suit to recover damages alleged to have been sustained from construction defects. Regan and others were subcontractors who worked on the project pursuant to subcontracts, each of which contained an indemnity provision in favor of the project's general contractor. The trial court had ruled that under the indemnity provision contained in the exemplar subcontract, the subcontractors had a current duty to defend the general contractor, regardless of any determination of their duty to indemnify the general under the subcontracts.

The Court of Appeal granted the petition and issued the writ directing the trial court to vacate its order and enter a new order denying the motion for summary adjudication.

The basis for the holding by the appellate court was that the issue of duty was not ripe for resolution. The court said: "No determination has yet been made as to whether the subcontractors were negligent in the performance of

their work, giving rise to a duty to indemnify and a related duty to defend. Pacific Scene has not clearly established that under this indemnity clause, the duty to defend against claims of liability is entirely free-standing of the duty to indemnify for liability arising out of a subcontractor's negligence." (*Regan Roofing Co.* v. *Superior Court, supra,* 24 Cal.App.4th at p. 436.) The *Regan* court went on to observe: ". . . the trial court's . . . ruling again is essentially advisory in nature and is premature . . . ." (*Id.* at p. 437.)

Concerning the questions of whether and under what circumstances an "issue of duty" may be a proper subject of summary adjudication, the *Regan* court, after observing that the Legislature "did not define what it meant by 'an issue of duty' " (24 Cal.App.4th at p. 434), compared the concept of duty in a negligence cause of action and in actions arising out of a contract, calling the latter "more far-reaching." (*Ibid.*)

With the *Regan* court's concept of contractual duty as a starting point, defendants assert that to argue that they had a "duty" to deliver accurate estoppel certificates "is like saying the seller had a 'duty' to deposit the grant deed into escrow . . . or that the seller had a 'duty' to turn over to the buyer copies of the leases and contracts . . . and that these everyday obligations of the parties to a contract which must be proved a trial are not 'issues of duty' contemplated by Code of Civil Procedure section 437c, subdivision (f)."

But defendants paint with a brush which is too broad for the fine points of the issue.

*Regan* does not support the defendants in the argument that normal and customary contractual performance obligations are not "duties" under Code of Civil Procedure section 437c, subdivision (f): *Regan* said: "It will thus be seen that the concept of duty in contract law may refer both to an overall contractual obligation or to a requirement of performance under an agreement." (*Regan Roofing Co.* v. *Superior Court, supra,* 24 Cal.App.4th at p. 434).

Defendants overlook the settled principle that the existence and scope of a duty is a question of law for the court. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

 We do not believe that the Legislature intended the words "an issue of duty" Code of Civil Procedure in section 437c, subdivision (f) to apply only to negligence causes of action—and neither does the court in *Regan,* which had no hesitancy in declaring it to be a "well established [rule] that a duty to defend [in the context of insurance contract law] is contractual in

nature [citation] and determination of such duty is a matter of law appropriate for summary adjudication." (*Regan Roofing Co.* v. *Superior Court, supra,* 24 Cal.App.4th at p. 435.)

This court does not intend to paint too broadly. We believe it may fairly be concluded from settled authority and upon a reasonable interpretation of legislative intent that if, under the facts and circumstances of a given case, a court finds it appropriate to determine the existence or nonexistence of a duty in the nature of a contractual obligation, it may properly do so by a ruling on that issue presented by a motion for summary adjudication.

■ In the instant case, the agreement does not specifically provide that defendants had a duty (contractual obligation) to deliver to plaintiffs an estoppel certificate containing an accurate statement of the current monthly rental from Leumi. Such language was, however, implicit in the obligatory language of the agreement and the court was asked to declare and define such duty by motion for summary adjudication.

We hold that, under these facts and circumstances, such motion was a proper subject for summary adjudication and the duty which was found was the kind of duty to which the Legislature intended Code of Civil Procedure section 437c, subdivision (f) to apply.

The other prong of defendants' challenge to the first judge's ruling on the issue of duty pertains not to the nature of the duty but to the effect of the ruling.

Defendants argue that, to be consonant with the legislative purpose of Code of Civil Procedure section 437c, subdivision (f), a ruling on summary adjudication which determines an issue of duty must, in the words of the *Regan* court, "dispose of an entire cause of action or affirmative defense . . . [or] terminate [some] portion of [an] action." (*Regan Roofing Co.* v. *Superior Court, supra,* 24 Cal.App.4th at p. 436.) Defendants assert that the first judge's ruling on the issue of duty did not have such dispositive effect and that, based upon the language of *Regan,* such ruling failed to meet the legislative requirement of the section.

This language from *Regan,* upon which defendants base their argument, seems clearly at variance from the language of Code of Civil Procedure section 437c, subdivision (f).

■ It will be noted from the text of Code of Civil Procedure section 437c, subdivision (f), *ante,* at page 516, that the substantive areas which may be challenged by motion for summary adjudication are stated in the

disjunctive—". . . a cause of action, an affirmative defense, a claim for damages *or* an issue of duty." (Italics added.) We believe that the plain meaning of this language is that a motion for summary adjudication may be granted or denied as to any one of these substantive areas, standing alone, and without reference to the dispositive effect of such ruling on any of the companion substantive areas. A ruling which "completely disposes" of an issue of duty as required by the last sentence of the section, but which has no dispositive impact on other issues would appear to be fully in conformance with legislative intent and the straightforward, unambiguous language of the section.

The language of *Regan* leaves no doubt that that court held strongly to the contrary view. The position which the *Regan* court stakes out concerning the interlocking relationship of the substantive areas of subdivision (f) was forcefully expressed when the court said: "In light of this authority [*Lilienthal & Fowler* v. *Superior Court* (1993) 12 Cal.App.4th 1848 [16 Cal.Rptr.2d 458]], we should analyze the trial court's ruling on the summary adjudication motion with a view to whether it promotes the evident legislative purpose of section 437c, subdivision (f), to prevent adjudication of issues which fail to dispose completely of a particular cause of action or defense, even where 'an issue of duty' is involved." (*Regan Roofing Co.* v. *Superior Court, supra,* 24 Cal.App.4th at pp. 433-434.)

For the reasons which follow, this court is compelled to the view that it cannot accept *Regan* as controlling precedent, with regard to summary adjudication of an issue of duty.

First, the quoted passages from *Regan Roofing Co.* v. *Superior Court, supra,* 24 Cal.App.4th 425, are clearly dicta. The holding on appeal in *Regan* pertained solely to an "issue of duty." The mandate issued because the appellate court determined that the trial court had not "completely disposed" of the issue of duty. That determination did not in any way implicate the dispositive effect of the ruling on the underlying causes of action or affirmative defenses, or any other portion of the proceeding.

Moreover, the authority upon which the court in *Regan* relies—*Lilienthal & Fowler* v. *Superior Court* (1993) 12 Cal.App.4th 1848 [16 Cal.Rptr.2d 458]—did not involve an issue of duty. At bar in *Lilienthal* was the question whether a trial court may refuse to rule under Code of Civil Procedure section 437c, subdivision (f) when such an adjudication would not dispose of an entire cause of action because two separate and distinct wrongful acts were combined in the same cause of action. The court held that the trial judge may not refuse to rule as to one claim, simply because, as a pleading

tactic, two claims are combined in the same cause of action. To rule otherwise, the court said, "would defeat the time and cost-saving purpose of the amendment . . . ." (12 Cal.App.4th at p. 1854.) The holding in *Lilienthal* is well reasoned, but the court had not a word to say about the impact of the ruling on the issue of duty.

Further, it appears that *Lilienthal, Regan* and the defendants in this case all placed heavy reliance upon a decision which has seemingly misconstrued the intent of the Legislature in enacting the 1990 amendment to Code of Civil Procedure section 437c, subdivision (f). The case is *City of Emeryville* v. *Superior Court* (1991) 2 Cal.App.4th 21 [2 Cal.Rptr.2d 826]. If, as all three decided cases contend, the overarching purpose of subdivision (f) is to completely dispose of a cause of action or an affirmative defense by summary adjudication, then the only course open to any court presented with an issue of duty would be to rule that defendant does not owe a duty to plaintiff. A contrary ruling would defeat the avowed purposes of summary adjudication, as propounded by *Lilienthal*, by allowing the action to proceed. Faced with facts that would compel a ruling that a duty was owed, the court would be forced to adopt the position taken by the trial court in *Lilienthal*— stand down and refuse to rule.

That was the judicial posture which was, in effect, endorsed by *City of Emeryville*. In that case, the court said: "This statement [the legislative statement accompanying the amendment of Code of Civil Procedure section 437c, subdivision (f) in 1990] and the wording of subdivision (f) show clearly that the Legislature wished to narrow summary adjudication from its broad focus on 'issues' . . . to a more limited focus on causes of action, affirmative defenses, claims for punitive damages, and *claims that the defendants did not owe plaintiffs a duty*." (2 Cal. App.4th at p. 25, italics added.)

The italicized language regarding duty was not the language of Code of Civil Procedure section 437c, subdivision (f) in 1991 and it is not the language today. Effective January 1, 1991 (*City of Emeryville* was filed December 26, 1991) subdivision (f) was amended to read, in relevant part: "If it is contended . . . (or) . . . that one or more defendants *either owed or did not owe a duty to the plaintiff or plaintiffs* . . . ." (Stats. 1990, ch. 1561 § 2, p. 7331, italics added.)

Currently, Code of Civil Procedure section 437c, subdivision (f)(1) provides, in relevant part: "A party may move for summary adjudication . . . if that party contends . . . that one or more defendants *either owed or did not owe a duty to the plaintiff or plaintiffs*." (Italics added.)

In our opinion *City of Emeryville*, in the passage quoted above, misconstrued the language of the report of the Senate Committee on the Judiciary

accompanying the amendment of Code of Civil Procedure section 437c, subdivision (f). (*City of Emeryville* v. *Superior Court, supra,* 2 Cal.App.4th at p. 25.) That misconstruction finds its latest expression in *Regan.*

*Regan* has been criticized in *Transamerica Ins. Co.* v. *Superior Court* (1994) 29 Cal.App.4th 1705 [35 Cal.Rptr.2d 259]. That case involved, among other issues, whether there was a duty to defend under a health care policy. The court said: "The question of whether a duty exists under certain circumstances is generally a question of law [citation] . . . . It is reasonable to conclude that this is why the Legislature included duty as an issue to be addressed in a motion for summary adjudication. The language of the statute is clear and unequivocal, a plaintiff may seek a determination of whether a defendant or defendants owed a duty to the plaintiff. We do not find [*Regan*] to be controlling under the circumstances here presented." (*Id.* at p. 1713.)

We hold that on a motion for summary adjudication, the court may rule whether a defendant owes or does not owe a duty to plaintiff without regard for the dispositive effect of such ruling on other issues in the litigation, except that the ruling must completely dispose of the issue of duty.

 In the instant case, the first judge's ruling on the issue of duty did dispose of the issue of duty, as required under Code of Civil Procedure section 437c, subdivision (f).

As an issue of law, we find no error in the ruling that defendants owed plaintiffs a duty to be accurate in furnishing the amount of Leumi's rent.

Neither side tarried long over the next two issues—issues C and D—and neither shall we.

C. *Was the instruction based upon issue 1 of the trial judge's order denying summary adjudication appropriate to give to the jury?*

 The instruction in question was marked "Special Instruction No. 34," which the trial judge gave over the defendants' objection. It read: "Defendant Wilshire Linden Associates Limited Partnership had a duty to deliver to plaintiffs in October, 1989, prior to close of escrow on the sale of the property at 9735 Wilshire Boulevard, Los Angeles, California, (hereinafter 'the property') an Estoppel Certificate that correctly stated the then current monthly rent for Bank Leumi." This instruction was not verbatim with, but was an accurate presentation of the language of the ruling.

Defendants argue that the effect of this instruction was "to permit the jury to reach the erroneous conclusion that solely because the Estoppel Certificate was not accurate the defendants breached their duty and were thus liable."

We disagree. This instruction properly guided the jury in determining whether there was a breach. There is not the slightest intimation in the language of the instruction to suggest to the jury what its finding should be regarding liability.

The argument that the instruction was not appropriate is without merit.

**D. *Did the jury instruction created by the court based on language in the order denying summary adjudication confuse and mislead the jury?***

Despite defendants' persistent reference to the denial of summary adjudication, this issue which flows from the granting of the motion for summary adjudication on the issue of duty poses a different objection to the same instruction (No. 34A) discussed in the previous issue. Here, defendants object to the instruction on the ground that it was given "standing by itself" with no instructions immediately before or after it to inform the jury on the applicability of the defenses of reliance and causation to breach of warranty. They argue: The harm of this ordering of instructions was compounded by giving instructions on reliance and causation as follow-up to instructions on fraud; as a result of these misarrangements, the jury was misled into thinking that the defenses of reliance and causation applied only to fraud; and thus, "The jury was left with a virtually directed verdict on the issue of breach of warranty." (*Ibid.*)

The argument is groundless and must be rejected.

The jury was not confused or misled in the slightest. It found both reliance by plaintiffs and causation of damages with reference to the cause of action for breach of contract and so indicated on the special verdict form.

Jurors are presumed to have understood instructions and to have correctly applied them to the facts as they find them. (*Summers* v. *Burdick* (1961) 191 Cal.App.2d, 464 [13 Cal.Rptr. 68].) This case is fully supportive of that presumption. The jury was instructed that it "must consider all the instructions as a whole and must regard each in light of the others." (BAJI No. 1.01) They followed that instruction unerringly.

The juxtaposition of these instructions was the cause of no prejudice to the defendants, nor were defendants prejudiced by the court's refusal to give their instructions concerning plaintiffs' putative independent investigation, a matter which will be discussed in connection with issue F.

E. *As a matter of law, did plaintiffs fail to show any causation by and/or reliance on the representations contained in the estoppel certificate?*

█ The document which is at the core of this litigation is the estoppel certificate for Leumi by which defendants represented in writing to plaintiffs the amount of monthly rent then being paid by Leumi.

To answer the issue posed and to set the estoppel certificate for Leumi in proper legal framework, it will be necessary to recount in some detail the relevant sections of the agreement and certain events leading up to the preparation and delivery of that document.

Section 8(d) of the agreement provides that defendants have delivered (or inferentially that they will promptly deliver) to plaintiffs true, accurate and complete copies of all leases and other contracts and related documents, and that in all such documents there shall be no "untrue statement of material fact or (failure) to state any fact which would be necessary, in light of the circumstances, to render the documents supplied not misleading." In the preamble to section 8, defendants, as seller, "represent, warrant and convenant" that the "representations and warranties" of section 8 "shall survive the close of escrow."

Among the documents delivered to plaintiffs were a copy of the rental agreement with Wells Fargo, and a rental statement (presumably the estoppel certificate), dated October 6, 1989 (exactly 20 days before close of escrow) showing Wells Fargo's rent to be $10,157.61 per month; also delivered was a copy of the sublease between Wells Fargo as sublessor and Leumi as sublessee.

What was not delivered, along with the information about the rents being paid by tenants, was any information about the rent being paid by Leumi. As noted, *ante*, Leumi had refused to sign an estoppel certificate. As late as four days prior to the close of escrow, plaintiffs' attorney advised plaintiffs by letter dated October 23, 1989, that Leumi's attorney had advised him that the bank was not obligated to sign an estoppel certificate but that he (the bank's attorney) would continue to process the request.

Also as noted, *ante*, Wells Fargo also refused to sign an estoppel certificate on behalf of Leumi.

When the parties met on July 12, 1989, to discuss the Wells Fargo buyout, plaintiffs made a pointed inquiry about the amount of Leumi's rent and were told by Donald Smith, a named defendant who was present, that the

rental could be computed by adding to Leumi's base monthly rental of $5,965.77, an incremental component for building operating expenses computed by taking 74.17 percent of the building's operating expenses then being paid by Wells Fargo.[1] The significance of 74.17 percent was that this was the portion of the square footage leased to Wells Fargo which was occupied by Leumi.

Plaintiffs did not know the amount of operating expenses which were then being "passed through" to the Wells Fargo lease and made an inquiry. They were given the number of $4,532.61 per month. Plaintiffs did the math as directed by Smith: $5,965.77 + 74.17% × $4,532.61 = $9,327.61.

Unknown to plaintiffs at the time, that amount of $4,532.61 as the number to be used in calculating Leumi's rent was an error so serious as to have been the genesis of this litigation. With one additional number, this lawsuit could undoubtedly have been avoided, but such are the vagaries of the course of complex transactions.

The component of the rent for Leumi to be derived from operating expenses was not the amount of such expenses currently assigned to Wells Fargo but only that portion of such expenses attributable to increases in such expenses since 1982. The missing number was, therefore, the operating expenses assigned to Wells Fargo for 1982; 74.17 percent of the difference between that number and current operating expenses added to base rent would have produced the figure of $6,177.60, which was the monthly rent being paid by Leumi in 1989.

On August 9, 1989 defendants delivered to plaintiffs certain documents regarding the Wells Fargo buy-out; on August 29, plaintiffs, in writing, authorized the buy-out and signed escrow instructions for that transaction on September 25. That escrow closed on October 10, 1989.

Close of the underlying escrow was fast approaching; defendants had still not furnished a document denominated a rent roll, as required by paragraph

---

[1]Section 5 of the Wells Fargo-Leumi lease provides as follows: "5 Rent. (a) Sublessee shall pay to sublessor as rent for the premises . . . the sum of $71,589.24 per annum payable in equal monthly installments of $5,965.77 . . . (b) Sublessee shall pay to sublessor as additional rent for the premises its pro rata share of all amounts . . . to be paid by the sublessor under the master lease except for the annual rent set forth in paragraph 4(a) of the master lease . . . For purposes of this paragraph, sublessee's pro rata share will be 74.17 percent. It is acknowledged that the rent of $5,965.77 per month provided in subparagraph 5(a) above includes and reflects increases in building expenses through December 31, 1982, which have been passed through under paragraph 4(b) of the master lease. Therefore to avoid a duplication by sublessee, sublessee shall be required to pay only such amounts under paragraph 4(b) of the master lease which are attributable to increases in building expenses in excess of building expenses for the calendar year 1982."

4(c) of the agreement. Accurate rental income figures were critical to plaintiffs, and they pressed defendants for this information.

It was not until October 18, 1989, nine days before the scheduled close of escrow, that defendants transmitted to plaintiffs by cover letter of that date a document referred to as a "rent statement" which purported to contain the information required by paragraph 4(c) of the agreement. The letter was equivocal concerning certain tenants and did not show a rental figure for Leumi, although by that time Leumi was a direct tenant of defendants.

By letter dated the next day, plaintiffs, in effect, rejected the rent statement because it had not been signed. They also reminded defendants that as of October 19, 1989, eight days from close of escrow, they had still not received any estoppel certificates.

On October 20, defendants transmitted certain estoppel certificates; on or about October 24, three days before close of escrow, defendants furnished a signed rent statement; on October 26, one day before scheduled close of escrow, defendants furnished several estoppel certificates signed by defendants for and on behalf of the ten tenants who had not yet signed estoppel certificates. Included among this last-minute group of estoppel certificates was one for Leumi certifying that Leumi's current monthly rent was $9,327.61—the same erroneous number which had been derived by plaintiffs in accordance with instructions received from defendants.

In preparing this estoppel certificate for Leumi, defendants asked one Steven Groom, an officer of the company which managed the building, to make the calculation of the rent being paid by Leumi and, in doing so, he made exactly the same mistake that Smith had made on July 12 when he verbally directed the plaintiffs to apply the 74.17 ratio factor to the amount of building expenses then being paid by Wells Fargo instead of to the smaller amount by which such expenses had increased since 1982.

When plaintiffs received their first rent check from Leumi in February 1990 in the amount of $6,177.60, they realized immediately that the economic viability of the building had been seriously jeopardized. They demanded that defendants make up the difference; defendants refused.

On the basis of these facts, defendants argue that plaintiffs did not rely on anything which defendants said or did, or on any information furnished by defendants, and, hence, plaintiffs were not caused to suffer any damages resulting from any act or conduct by defendants.

The record does not support defendants' argument.

The plaintiffs most assuredly relied on the mistaken formulation for the calculation of Leumi's rent furnished by defendants. Plaintiffs were continually calculating and recalculating the economics of the building. There could be no serious question that plaintiffs plugged into those calculations the higher number for Leumi's rent.

Through the course of the open escrow, there were several occasions when plaintiffs relied on the calculated Leumi rent: when plaintiffs authorized the Wells Fargo buy-out on August 29, 1989; when they signed the separate escrow instructions for that transaction on September 25; and when, later on, they authorized the release of the deposit in escrow and agreed to the payment of a sizable loan fee. It may reasonably be supposed that plaintiffs placed full reliance on defendants' erroneous instructions in making all of these key decisions.

On the last day of escrow, defendants, in calculating Leumi's rent, used the same erroneous methodology as they had instructed plaintiffs to use, and made the same error. This time, any doubt whether plaintiffs placed complete and unequivocal reliance on defendants' erroneous instructions would have to be dispelled by plaintiffs' profoundly comforting realization that both sides of the bargain had performed the math and had come up with the same (wrong) answer. By every intendment of logic and fairness, the plaintiffs were entitled to rely on the correctness of $9,327.61. Thus reassured, they allowed escrow to close.

The question posed at the top of the discussion of this issue was: As a matter of law, did plaintiffs fail to show any causation by and/or reliance on the representation contained in the Leumi estoppel certificate?

This court concludes that plaintiffs not only did not fail as a matter of law to show reliance and causation, but succeeded in proving such prerequisite conditions to a claim for damages in this case by the overwhelming preponderance of the evidence.

F. *Did the court commit prejudicial error in refusing to give jury instructions on the effect of an independent investigation on reliance and causation as elements of the breach of warranty claim?*

■■■ Defendants' argue as follows: Plaintiffs hired a team of professional advisers; plaintiffs and those advisers analyzed all the leases, including Leumi's sublease; plaintiffs made an independent investigation and their own miscalculations of Leumi's rent; the trial court erred because it did not instruct the jury as to the effect of an independent investigation on a claim

for breach of warranty but rather only as to fraud; the court improperly rejected defendants' instructions pertaining to independent investigation which advised the jury, among other things, that a purchaser who undertakes his own independent investigation is conclusively presumed to have been fully informed. In sum, the trial court's failure to instruct as requested by defendants on independent investigation was prejudicial error.

The argument, in all of its several parts, must fail for the following reasons: The trial court did instruct on independent investigation and the impact of such investigation on the plaintiffs' right to recover. There was no error in the trial court's implicit finding that defendants' proposed special instructions on the subject should be refused because they would be duplicative, confusing and not helpful to the deliberative process.

Defendants' assertion that the juxtaposition of the independent investigation instructions in relation to instructions on the basic elements of breach of warranty and fraud causes of action was confusing and misleading to the jury has been considered and rejected earlier in this opinion, and the bases for such rejection need not be repeated.

Finally, defendants, in contending that plaintiffs made their own miscalculation of Leumi's rent based upon their own independent investigation, are simply wrong on the facts.

The only kind of independent investigation which would have had any relevance to this argument would have been an investigation into the amount of the building's operating expenses for the year 1982. The record is clear that plaintiffs did not inquire about that amount, and plaintiff did not have that number through the time escrow closed and apparently neither did defendants. Plaintiffs took Smith at his spoken word on July 12: He told plaintiffs, in effect, that the only numbers they would need were Leumi's base rent, the current operating expenses paid by Wells Fargo and 74.17 as a percentage of the latter to add to the former. Defendants did not advise plaintiffs of this incorrect formulation until the damage had been done.

Plaintiffs did not perform a miscalculation; their arithmetic was flawless, based upon the formulation furnished by defendants.

Groom was forthright in his testimony: He admitted on the witness stand that it would have been necessary to have the 1982 operating expense for an accurate calculation; that he had never furnished the figure to the plaintiffs and that, in fact, he himself had never obtained the figure because he had no need for it.

Plaintiffs, through Matt Pouration, testified that they did not inquire about Leumi's rent, and that they were "smart enough" to make proper use of the figure for 1982 operating expenses in making a calculation of the rent, but he was "directed to do it otherwise . . . by Mr. Don Smith."

Defendants are plainly in error in asserting that "[a]ll of the information necessary to prevent the problem from having occurred was provided to plaintiffs between June and August, 1989."

The final question with regard to an independent investigation is: Did plaintiffs have a duty to undertake an independent investigation as to the correct method for computing Leumi's rent and the amount of that rent? The answer from well established authority is "no." In *Teague v. Hall* (1916) 171 Cal. 668 [154 P. 851] the court said: ". . . it must be held that the court erred in directing the jury . . . that a party who has relied upon a misrepresentation made by another and has suffered injury thereby is precluded from recovering if he had an opportunity, and did not avail himself thereof, to test the truth of the representations by independent investigation." (*Id.* at p. 670.) The *Teague* court quotes from Pomeroy, Equity Jurisprudence (1882) section 896 as follows: " 'whenever a positive representation of fact is made, the party receiving it is, in general, entitled to rely and act upon it, and is not bound to verify it by an independent investigation.' " (171 Cal. 668 at p. 670.)

It has been repeatedly held by the courts of our state that one to whom a representation is made has no duty to employ means of knowledge which are open to that party and which could, if pursued, reveal the falsity of that representation. (*Ruhl v. Mott* (1898) 120 Cal. 668, 676 [53 P. 304]; *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 508 [262 Cal.Rptr. 689].)

This principle, holding as it does the potential for harsh results, must be applied carefully to the facts of each case. The court in *Shearer v. Cooper* (1943) 21 Cal.2d 695 [134 P.2d 764], quoted with approval from *Dow v. Swain* (1899) 125 Cal.674 [58 P. 271], where the court said with reference to this principle: " 'Every case must be judged for itself, and the circumstances which warrant or forbid relief cannot be scheduled.' " (*Shearer supra,* 21 Cal.2d at p. 704; *Dow, supra,* 125 Cal. at p. 683.)

In hindsight, it might be argued that plaintiffs and their experts read paragraph 5 of the sublease too quickly and that a more careful reading would have alerted them to the inaccuracy of the formulation which they had been furnished by plaintiffs. Viewed in terms of the quickly moving events at the time, we conclude that plaintiffs cannot be charged with dereliction of any duty to undertake to prove defendants inaccurate. On the contrary,

plaintiffs had every right to rely upon the information received from defendants about the calculation of Leumi's rent. The so-called "pass-through" computation appears daunting at best, and who better to know its intricacies than defendants. As expressed by *Teague*, knowledge of the plaintiffs sufficient to prevent them from " 'relying on and being misled by [the representation] . . . [is not] clearly and conclusively established by the evidence.' " (*Teague* v. *Hall*, *supra*, 171 Cal. at p. 670.)

We conclude that there was no error in refusing to instruct the jury as defendants requested on the effects of an independent investigation by plaintiffs.

G. *Did the court commit prejudicial error in refusing to give a jury instruction on whether the factual representations made by defendants were a substantial factor in bringing about plaintiffs' injury?*

■ The trial court instructed the jury on damages for breach of contract. It gave BAJI No. 10.90, modified only to reflect the type of damages sought by plaintiffs. In a contract action, the damages recoverable by an aggrieved party are those "proximately caused" by the breach. (Civ. Code, § 3300.) BAJI No. 10.90 is faithful to this requirement of causality and leaves not a trace of a doubt that contract damages must be "caused by the breach."

Since California has its own "particular" definition of cause, the trial court also gave BAJI No. 3.76 which reads as follows: "The law defines cause in its own particular way. A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm." (BAJI No. 3.76.)

The court did, therefore, instruct the jury on substantial factor.

There is no judicially approved definition of substantial factor for causation purposes, (see Com. to BAJI No. 3.76) and as will appear, *post*, there is no need for one.

Defendants argue on appeal that the trial court erred in refusing two special instructions in which they attempted to define substantial factor. Their attempts were unsuccessful as to both instructions, and refusal of both was not error.

Defendant's "Special Instruction No. 17," which the trial court refused, states, in substance, that if plaintiffs' loss would have occurred even if defendant had fully performed, then any breach by defendant cannot be

considered a substantial factor. Aside from being an oxymoron (a breach when there has been full performance), the statement is not supported by defendants' cited authorities.

"Special Instruction No. 16," which the trial court also refused, simply restates the rule of causality and begs the question of how to define substantial factor. The case cited by defendants in support of their definition of substantial factor, *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872], is, in fact, the seminal case holding that substantial factor should not be further defined. *Mitchell* held that: 1) the continued use of former BAJI No. 3.75—the "proximate cause" instruction—is disapproved; 2) the judicial stamp of approval will be put on BAJI No. 3.76—the "substantial factor" instruction—as the proper means of submitting the question of causation in fact to the jury; and 3) no further definition of "substantial factor" is necessary or appropriate. In connection with the question of further definition, the court quoted with approval the following statement by Prosser, *Proximate Cause in California* (1950) 38 Cal.L.Rev. 369: The phrase (substantial factor) "is 'sufficiently intelligible to any layman to furnish an adequate guide to the jury, and it is neither possible nor desirable to reduce it to lower terms.' " (*Mitchell* v. *Gonzales*, *supra*, 54 Cal.3d at p. 1052.)

Jurors are presumed to understand meaning and use of words in their common and ordinary application. (*Foss* v. *Oliver J. Olson & Co.* (1967) 250 Cal.App.2d 44 [58 Cal.Rptr. 511].)

In sum: The trial court adequately instructed the jury on the causality of damages and committed no error in refusing defendants' special instructions Nos. 16 and 17.

A final word in regard to causality. The first trial judge ruled on motion for summary adjudication that defendants had a duty to deliver an estoppel certificate which correctly stated Leumi's then current monthly rental. This court has approved that ruling. The jury found by substantial evidence that when defendants put into escrow an estoppel certificate which incorrectly stated Leumi's rent, defendants therewith breached the contract.

That breach was, of course, only a partial breach because defendants had otherwise performed faithfully under the contract over the course of several months. It is the opinion of this court, however, that such breach was material, (Rest.2d Contracts, § 241) thus giving plaintiffs the right to seek damages. (*Borgonovo* v. *Henderson* (1960) 182 Cal.App.2d. 220, 231 [6 Cal.Rptr. 236]; Rest.2d Contracts, § 242.) Any nonperformance of a duty

under a contract when performance is due is a breach. This includes defective performance as well as an absence of performance; defective performance can be inadvertent as well as intentional, and the duty can be imposed by the court as well as by a promise stated in the agreement.

Defendants having breached their agreement with plaintiffs, the ultimate question which must be addressed is: Was the breach a substantial factor in causing plaintiffs to be damaged? The answer is that such breach was unequivocally and unassailably a substantial factor in causing plaintiffs to be damaged.

### H. Did the court err in not granting a directed verdict?

In arguing for the affirmative response to the issue, defendants state that their motion, which was made at the conclusion of the evidentiary portion of the trial, was based principally on the "conclusive presumption arising from an independent investigation." This court has discussed, *ante*, the matter of plaintiffs' asserted independent investigation and has found and held that, with reference to the miscalculations of Leumi's current monthly rent there was no independent investigation by plaintiffs and that plaintiffs had no duty to conduct such an investigation.

Thus, the trial court did not err in denying defendants' motion for directed verdict.

No other ground for directed verdict is urged on appeal by defendants, and none has been found in the record by this court.

#### DISPOSITION

The judgment is affirmed.

Johnson, Acting P. J., and Woods, J., concurred.

A petition for a rehearing was denied April 2, 1998, and appellants' petition for review by the Supreme Court was denied May 27, 1998. Mosk, J., and Brown, J., were of the opinion that the petition should be granted.