Filed 9/14/21  In re Z.R. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| Guardianship of Z.R., a Minor. | 2d Civil No. B300696 (Super. Ct. No. BP168313) (Los Angeles County) |
| EARL DUFFIE, SR., et al., Petitioners and Respondents, v. C.R., Objector and Appellant. | |

      C.R. appeals from the probate court's order granting permanent guardianship of her son, Z.R., to his paternal grandparents, Earl and Verlene Duffie.[1]  C.R. contends the order must be vacated because:  (1) the court failed to issue a written statement of decision, and (2) substantial evidence does not support the order.  We affirm.

---

[1] We use the Duffies' first names for clarity.

## FACTUAL AND PROCEDURAL HISTORY
### *C.R. and her son, Z.R.*

C.R. is a survivor of sex trafficking. She was abducted in 2010, when she was just 13 years old, and trafficked for the next three years. While trafficked, police arrested her for prostitution. The juvenile court ordered her to serve a term of probation after her arrest.

At age 17, C.R. was impregnated by a 19-year-old drug dealer who had been in and out of prison. C.R. needed stable housing during her pregnancy, which the father was unable to provide. The probation department assigned her to St. Anne's Maternity Group Home, where she gave birth to Z.R. The father was incarcerated at the time, and was not involved in Z.R.'s life.

As a condition of her probation, C.R. had to maintain her placement at St. Anne's. While there, she received various certificates and awards. It proved difficult for her to abide by the rules, however. She left without permission, left Z.R. unattended, had him in her room and bed, and "mishandl[ed]" or "rough" handled him. Eventually, C.R. agreed to let the father's parents, Earl and Verlene, take custody of Z.R. while she secured housing and employment. The probate court later appointed Earl and Verlene as Z.R.'s temporary guardians.

Between May and October 2015, C.R. lived in four different shelters, but managed to graduate from high school. She also continued to visit her son. Personnel monitoring the visits noted C.R.'s continued "rough handling" of Z.R. and reported it to Earl and Verlene, who petitioned the probate court for permanent guardianship of Z.R. C.R. objected to the petition and filed a petition to terminate the temporary guardianship.

*Trial proceedings*

Trial on Earl and Verlene's petition began in November 2016, lasting six days over the course of eight months. Violet Dawson, a probation officer who last interacted with C.R. and Z.R. more than 18 months before trial, testified that C.R. shook her son and "pound[ed] on [him]." Verlene testified that C.R. acted inappropriately with Z.R. by referring to him as "sexy" and putting her tongue in his mouth. Earl also said C.R. put her tongue in Z.R.'s mouth and handled him "rough[ly]."

Dee Dee Mascarenas, an expert in relationship attachment, child development, and trauma, testified that Z.R. "ha[d] had enough losses in his life" and that "it would be important to reduce more loss." She said that C.R. needed the assistance of others to develop her parenting skills. Because those skills would take at least two years to develop, she recommended a transition plan that would incrementally increase C.R.'s time with her son and eventually lead to reunification.

During trial, the court noted that C.R. displayed a lack of maturity. C.R.'s emotional development was akin to that of a 13- or 14-year-old. The court told C.R. that she needed to work on her immaturity issues with a therapist.

The court also expressed concern about Z.R.'s stability: "[He's] not an inanimate object that can just be moved around like a potted plant. All right? [He's] not—the child's not a toy." As to C.R., the court said that it was "looking for a pattern of constructive accomplishment or improvement." She needed to show "some sort of . . . financial stability and responsibility." Whether C.R. could demonstrate that stability and responsibility was the factor on which the petitions hinged.

At the conclusion of trial, the court declined to grant the petition for permanent guardianship, and instead extended the temporary guardianship for two years. That transition period would give C.R. time to "turn [it] around and impress" everyone by progressing toward the financial stability necessary to have Z.R. returned to her care.

*Posttrial proceedings*

C.R. had several unsupervised visits with her son after trial. Not all were successful. Over the span of 10 months, Z.R. suffered five documented injuries: an allergic reaction to orange juice, an allergic reaction to blue dye in a cookie, two bruises, and a broken nose. These injuries prompted Z.R.'s appointed counsel to file a request to modify C.R.'s visits. The court granted the request and ordered supervised visits.

Two years after the conclusion of trial, C.R. requested that the probate court continue her transition plan and terminate the temporary guardianship. She also requested a statement of decision "laying out the factual basis for the [c]ourt's finding that returning [Z.R.] to [her] care would be detrimental to him."

At a July 2019 status hearing, C.R. reiterated her request for a statement of decision "regarding the basis for detriment" if the court were to grant Earl and Verlene's request for a permanent guardianship. The court declined to do so. It told C.R. that she had "ignored" its direction to get a job and create a stable environment for Z.R. And during the argument of Z.R.'s appointed counsel, the court told C.R. that her nonverbal testimony—rolling her eyes and throwing up her hands—was prohibited. C.R. ignored the court's admonishment, interrupting counsel's argument by exclaiming, "This is my son you're talking

4

about.  This is my child you're talking about.  You act like I don't love my kid."  The hearing ended immediately thereafter.

The court issued two minute orders after the hearing.  In the first, the court found that, "based [on] the reading of the moving papers and consideration of all presented evidence," there was sufficient evidence to support appointing Earl and Verlene as Z.R.'s guardians.

The court's second order denied C.R.'s petition to terminate Earl and Verlene's guardianship.  The court viewed its task as "determin[ing] what [was] in the best interest of [Z.R.], including [his] health, safety[,] and welfare, and who [was/were] the more appropriate guardian(s) to facilitate that goal."  Though C.R. loved her son, Earl and Verlene "ha[d] provided a safe, stable[,] and loving home" and had provided "continuity and a nurturing environment."  The court was thus unwilling to restore [Z.R.] to his mother's custody unless she showed that she had established "a steady pattern of therapy, reunification therapy, residence, work[,] and/or school[,] including responsible and mature behavior at all times with the minor, with the temporary guardians, [and] in the courtroom"—things she had failed to do over the preceding two years.  In short, the court was "not convinced [that C.R.] appreciate[d] her responsibilities as a parent and [was] not taking the[] proceedings seriously."  There was thus clear and convincing evidence that it would be detrimental to remove Z.R. from Earl and Verlene's home.

At a later status hearing, C.R. asked the court to clarify whether it had granted Earl and Verlene temporary or permanent guardianship of Z.R.  The court said that it had granted permanent guardianship.  C.R. then renewed her request

5

for a statement of decision.  The court refused because C.R. "didn't ask for [the statement with] specificity under the rules."

## DISCUSSION

### *Statement of decision*

C.R. contends the order granting permanent guardianship should be vacated because the court erroneously and prejudicially rejected her request for a statement of decision. We disagree.

"Upon the trial of a question of fact in a proceeding to determine the custody of a minor child, the [probate] court shall, upon the request of either party, issue a statement of the decision explaining the factual and legal basis for its decision."  (Fam. Code, § 3022.3.)  A statement of decision may also be required after a "'special proceeding,'" such as a child custody determination.  (*In re Rose G.* (1976) 57 Cal.App.3d 406, 418.)  If required, the statement "shall be in writing," and must respond to the "controverted issues" specified by the requesting party. (Code Civ. Proc., § 632.)  A court's failure to issue a properly requested statement requires reversal unless that failure was harmless—i.e., did not "result[] in a miscarriage of justice.'" (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1102.)

Here, any error in refusing to issue a written statement of decision was harmless.  Before granting a nonparent's request for permanent guardianship of a child, a court must find, by clear and convincing evidence, that:  (1) "granting custody to a parent would be detrimental to the child," and (2) "granting custody to the nonparent is required to serve

6

the best interest of the child." (Fam. Code, § 3041,[2] subds. (a) & (b); see also *In re B.G.* (1974) 11 Cal.3d 679, 683.) "'[D]etriment to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of [their] parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." (Fam. Code, § 3041, subd. (c).) It "does not require any finding of unfitness of the parents," however. (*Ibid.*)

At the conclusion of the July 2019 status hearing, the court issued two minute orders. In one, the court stated that it had read all of the moving papers, considered all of the evidence, and found sufficient evidence to appoint Earl and Verlene as Z.R.'s guardians. In the other, the court was more specific, finding that Earl and Verlene "ha[d] provided a safe, stable[,] and loving home" for Z.R. and had provided him with "continuity and a nurturing environment." C.R., in contrast, had failed to regularly participate in therapy, did not have a stable residence, and had not secured steady employment. She also failed to "appreciate her responsibilities as a parent" and had not taken the custody proceedings "seriously." To the court, this was clear and convincing evidence that it would be detrimental to return Z.R. to C.R.'s care and that granting custody to Earl and Verlene instead would be in the child's best interest. No more was required by the Family Code.

That the court made its findings in an order purportedly denying C.R.'s request to terminate the temporary

---

[2] The Legislature amended Family Code section 3041 effective January 1, 2020. References here are to the provisions in effect when the probate court made its findings.

7

guardianship rather than in the order granting permanent guardianship of Z.R. is of no consequence. Deciding a case based on a mistitled order "would be to exalt form over substance," something we cannot do. (*Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 516.) Because the court made the required findings and explained the factual and legal basis for them, any error in failing to issue a statement of decision did not result in a miscarriage of justice.

*Permanent guardianship award*

C.R. next contends there was insufficient evidence to support the court's decision to award Earl and Verlene permanent guardianship of Z.R. We again disagree.

When tasked with "reviewing a finding that a fact has been proved by clear and convincing evidence, the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.) "[I]n making this assessment [we] view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.) But it is immaterial whether we would have drawn those same inferences (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812); our job is not to reweigh evidence or reevaluate witness credibility (*People v. Jones* (1990) 51 Cal.3d 294, 314).

Substantial evidence supports the decision to grant Earl and Verlene permanent guardianship of Z.R. As set forth above, before granting the guardianship request the court had to

8

find that granting custody to C.R. would be detrimental to Z.R. and that granting custody to Earl and Verlene instead would be in Z.R.'s best interest. The evidence supports these findings. For example, several witnesses testified that C.R. was too rough or "inappropriate" when she interacted with her son. C.R.'s own expert testified that it was "important" to reduce the amount of loss in Z.R.'s life. She also said that C.R. needed time to develop better parenting skills.

Two years after trial, C.R. had yet to develop those skills. Z.R. suffered several injuries while in her care, which led to the reinstatement of supervised visits. C.R. did not have a stable job or secure housing. She had not participated in sufficient services, and failed to "appreciate her responsibilities as a parent." She also failed to take the guardianship proceedings "seriously" and displayed immaturity by rolling her eyes at the court, throwing up her hands, and interrupting arguments. Earl and Verlene, in contrast, had cared for Z.R. for nearly his entire life, providing him with a "safe, stable[,] and loving home" and giving him "continuity and a nurturing environment." Based on the evidence, a reasonable factfinder could have found it highly probable that disrupting that environment would be detrimental to Z.R., and maintaining it would be in his best interest. Substantial evidence thus supports the court's order granting Earl and Verlene's request for permanent guardianship.

## DISPOSITION

The probate court's order granting Earl and Verlene Duffie's request for permanent guardianship of Z.R., entered July 16, 2019, is affirmed.

<u>NOT TO BE PUBLISHED.</u>

TANGEMAN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

Elizabeth A. Lippitt, Judge

Superior Court County of Los Angeles

_____

Mayer Brown, Donald M. Falk, Sarah E. Balkissoon; Family Violence Appellate Project, Shuray Ghorishi, Arati Vasan, Jennafer Dorfman Wagner and Erin Smith for Objector and Appellant.

Levin Simes Abrams, Angela J. Nehmens and Brian J. Perkins for Coalition to Abolish Slavery & Trafficking, Freedom Network USA, and HEAL Trafficking as Amici Curiae on behalf of Objector and Appellant.

Mariam E. Hanna for Petitioners and Respondents.