Filed 6/20/14

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PARAMOUNT PETROLEUM CORPORATION, a Delaware corporation,<br><br>    Petitioner and Defendant,<br><br>    v.<br><br>SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,<br><br>    Respondent;<br><br>BUILDING MATERIALS CORPORATION OF AMERICA, a Delaware corporation,<br><br>    Real Party in Interest and Plaintiff. | B253290<br><br>(Los Angeles County Super. Ct. No. BC481673) |

ORIGINAL PROCEEDINGS in mandate. Malcolm H. Mackey, Judge. Petition granted in part and denied in part with directions.

McCool Smith Hennigan, J. Michael Hennigan, Peter J. Most, Michael Swartz and David M. Ross; Greines, Martin, Stein & Richland, Irving H. Greines and Marc J. Poster for Petitioner and Defendant.

No appearance for Respondent.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, Thomas R. Freeman, Mark T. Drooks and Jessica S. Chen for Real Party in Interest and Plaintiff.

_____

Plaintiff and real party in interest Building Materials Corporation of America dba GAF Materials Corporation (GAF) brought the instant breach of contract action against defendant and petitioner Paramount Petroleum Corporation (Paramount). GAF had entered into a long-term contract with Paramount by which Paramount would supply GAF with its requirements for asphalt coating for GAF's manufacture of roofing shingles. The asphalt coating was to be made from Oriente crude oil, from Ecuador. Rather than linking the price of the asphalt coating to the price of Oriente, the parties agreed to link the contract price to that of another type of oil, West Texas Intermediate (WTI), as the prices of the two oils had, historically, moved up and down together, and WTI was readily quoted. Several years into the contract, changed circumstances led to the decoupling of the market price for Oriente and the market price for WTI. Specifically, there was an excess of oil competing with WTI and its price dropped dramatically, while Oriente's price remained relatively high. As a result, from Paramount's point of view, it became economically infeasible for it to continue to supply GAF with asphalt coating (made from Oriente) at the contract price. When negotiations failed to result in a higher contract price, Paramount terminated performance. GAF brought the instant action for breach of contract. GAF then moved for summary adjudication of the issue of Paramount's liability for breach of contract, but not on the issue of damages. GAF also moved for summary adjudication on several of Paramount's affirmative defenses, including mutual mistake. GAF's motion was granted in its entirety.

Paramount sought writ relief and we issued an order to show cause. We now conclude that: (1) the trial court erred in granting summary adjudication in GAF's favor on liability, because summary adjudication cannot be granted in favor of a plaintiff on liability alone; but (2) the trial court did not err in granting GAF summary adjudication on Paramount's defense of mutual mistake. We therefore will grant the petition in part and deny it in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Facts Leading to the Contract*

GAF is in the business of manufacturing and selling roofing shingles. It is the largest manufacturer of residential roofing systems in the United States, and it manufactures roofing shingles at four different facilities in California. One of the materials used to manufacture shingles is asphalt coating.[1] While it is not necessary for the purposes of our discussion to understand the process by which asphalt coating is produced from crude oil, two facts are very relevant: first, not all types of crude oil are acceptable for this process; GAF uses a battery of proprietary tests to determine whether any particular crude will be sufficient for its asphalt coating; second, asphalt coating has a very limited shelf life and must therefore be produced near the shingle manufacturing factory.

---

[1] Another necessary product is asphalt saturant. The agreement at issue in this case involved both asphalt coating and asphalt saturant. The pricing issue that arose related only to the price of asphalt coating. We therefore limit our discussion to asphalt coating.

Prior to December 2007, pursuant to a prior agreement, Paramount supplied GAF's requirements for asphalt coating with coating produced out of Alaskan North Slope crude. When the price of that oil increased, Paramount sought to use a different type of oil and proposed Oriente crude. GAF tested Oriente and approved it.

By this time, Paramount had (through acquisitions) become the largest supplier of asphalt products on the west coast and was the only supplier with sufficient volume to meet GAF's requirements. GAF therefore sought a long-term agreement with Paramount that would assure that it would be supplied with necessary asphalt coating. The parties negotiated the agreement at issue in this case.

2.    *The Contract*

The parties entered into the contract effective December 1, 2007. The contract had a term running to June 30, 2013. Additionally, it would be extended for five additional one-year terms, unless GAF, in its sole discretion, chose to terminate it. Pursuant to its terms, Paramount would supply GAF with all of its requirements for asphalt coating for three of its California facilities, and 75% of its requirements for its fourth facility. Parmount was to produce the coating only from Alaskan North Slope or Oriente crude, unless the parties agreed in writing to another type of crude. GAF was required to provide regular forecasts of its anticipated purchase requirements.

As to pricing, the contract gave GAF discretion to choose between two different methods of pricing asphalt coating.[2] The first method was called "Index Pricing" by the

---

[2]    Under the contract, GAF was permitted to switch between the two pricing methods on sufficient notice. The amount of necessary notice is somewhat ambiguous.

5

parties; the second was "Formula Pricing." In order to avoid confusion, we refer to the first method as "Asphalt Index Pricing" and the second as "WTI Formula Pricing." Under Asphalt Index Pricing, the monthly price for asphalt coating would be based on the prior month's average quoted price for asphalt cement or roofing flux, as quoted in identified indices. Under WTI Formula Pricing, the monthly price for asphalt coating would be based on the prior month's average daily closing price for WTI crude.[3] The contract further provided, with respect to WTI Formula Pricing, that "[i]f WTI crude is no longer quoted or becomes illiquid, an alternative formula basis as mutually agreed by the parties and manifesting a commercially reasonable substitute for the WTI crude quote will be used." It further provided that if the parties agreed that Paramount could use a different type of crude for the asphalt coating, "the price basis of the [coating] will be subject to mutual agreement . . . . "

The contract contained several pricing protections for GAF, but not for Paramount. Specifically, if GAF received a better price offer from another supplier, Paramount must either meet that price, or GAF would be free to purchase its requirements from the other supplier. Moreover, if Paramount sold asphalt coating to

It appears that GAF could initially switch pricing methods on 30 days' notice, but must give 90 days' notice for future changes.

[3]    Specifically, the asphalt coating price would be calculated as follows: (1) calculate the average of the daily closing price for WTI crude in the prior month; (2) add $3.96 per barrel; (3) multiply by 5.66 to establish price per ton; and (4) subtract $6.00 per ton. This calculation adjusted the WTI price downward to account for the historically lower price of Oriente. According to Paramount, the difference per barrel built into this formula was $7.07.

6

another buyer for a price lower than the contract price, GAF would be entitled to receive that lower price.

The contract also included a severability clause. It provided, "Any provision hereof which is (at any time) legally unenforceable shall be ineffective only to the extent of such unenforceability without thereby invalidating the remaining provisions hereof (including the remaining enforceable portion of any affected paragraph) or affecting the validity or enforceability of this Agreement as a whole. Such invalidated provision shall be replaced by the Parties hereto with a valid provision that most closely reflects the intent of the Parties in the invalidated provision."

### 3. *Performance Under the Contract*

Pursuant to the terms of the agreement, pricing under the agreement was originally calculated using Asphalt Index Pricing. In October 2008, GAF gave notice to switch to WTI Formula Pricing effective November 8, 2008. Performance under the agreement continued without issue,[4] using that pricing alternative, until early 2011.

WTI was regularly quoted at Cushing, Oklahoma. In early 2011, there was an unanticipated glut of oil at Cushing. The reasons for this glut are described by Paramount, somewhat generally, as follows: (1) an "astonishing amount" of crude was obtained in North America by means of hydraulic fracturing or "fracking," which oil

---

[4] This may not be entirely accurate. Paramount contends that GAF did not properly perform under the contract, specifically arguing that GAF was padding its forecasts for its asphalt coating needs. As we shall discuss, whether GAF properly performed under the contract is an issue to be determined at trial; we express no opinion on the issue.

ended up at Cushing; and (2) the lack of existing infrastructure at Cushing to transport this additional crude oil to refineries for processing.[5] While there may be some dispute as to the precise causes, Paramount and GAF agree that the Cushing glut caused the price of WTI to decrease dramatically relative to world oil prices, including Oriente.

In the summer of 2011, Paramount asked to discuss with GAF "the hardship to Paramount created by the decline in the market price of WTI crude relative to Oriente crude." Discussions were held, but were fruitless. At one point, Paramount suggested the selection and approval of a third type of crude.[6] GAF tested Paramount's samples of three different types of crude. Although GAF approved one of those samples as meeting its requirements, Paramount then reported that it could not, in fact, obtain that crude.

---

[5] A more nuanced explanation was provided in the lengthy and detailed declaration of Paramount's expert economist, George R. Schink. He stated that, in addition to the *unanticipated* increase in production caused by fracking, it was expected that Western Canadian crude oil production would further increase the supply of crude oil production to the "Midcontinent area." However, it was expected that new pipeline projects would be constructed to transport a substantial portion of this increased production to the U.S. Gulf Coast. The Western Canadian crude production did increase as expected, but the anticipated pipeline projects were not constructed. This resulted in more Western Canadian crude ending up in the Midcontinent area than the Gulf Coast, which contributed to the glut at Cushing. Moreover, although the evidence is not as clear as it could be, it does not appear that the increase in oil at Cushing was an increase in *WTI crude* itself. Instead, the additional oil (obtained by fracking and/or Western Canadian production) caused an excess of oil at Cushing, which, presumably, negatively affected the price of WTI. Thereafter, "market participants began to sharply increase their inventory holdings of crude oil at Cushing and elsewhere in the Midcontinent area in anticipation of the WTI eventual return to full value."

[6] This was presumably because the approval of another type of crude would trigger the provision of the agreement setting the new price by mutual agreement.

4. *Paramount Terminates Performance*

By a letter dated March 16, 2012, Paramount informed GAF that it was terminating performance under the contract. Its letter stated that Paramount was taking such action because GAF had "refused to honor the spirit of the Agreement by acknowledging that WTI is no long[er] a reasonable proxy for Oriente prices." Having incurred millions of dollars in losses, Paramount stated that it was unreasonable and impracticable for it to continue. It stated, "Until such time as GAF acts reasonably by agreeing to reform the Agreement in a manner that reflects the original intent of the parties, Paramount is not in a position to continue [p]roduct deliveries."

GAF still needed asphalt coating in quantities that only Paramount could supply. It therefore continued to purchase coating from Paramount but at prices *unilaterally* set by Paramount. In March 2013, while this action was pending, Paramount stopped selling asphalt coating to GAF entirely.

5. *Allegations of the Complaint*

GAF brought the instant action shortly after Paramount terminated the contract.[7] The operative complaint is the first amended complaint; it states a single cause of action for breach of contract. The complaint alleges that "[a]t the time the [a]greement was entered into on December 1, 2007, the pricing mechanism set forth in the Agreement was just, fair and reasonable as to Paramount, and the consideration for asphalt coating

---

[7] The record does not reflect the date that this action was initiated. The first amended complaint, however, was filed on April 27, 2012, less than six weeks after Paramount terminated the contract.

9

and asphalt saturant under the Agreement therefore is adequate." GAF alleged

Paramount's breach, and sought damages, specific performance, injunctive relief,[8] and

attorney fees (pursuant to a clause in the agreement).

Paramount filed an answer consisting of a general denial and numerous

affirmative defenses. Among others, Paramount raised the affirmative defense of

mistake of fact.[9]

6. *GAF's Motion for Summary Adjudication*

On August 14, 2013, GAF moved for summary judgment or, in the alternative,

summary adjudication. Although GAF purported to seek summary judgment on its

complaint, it specifically indicated that it was "not seeking summary judgment on the

amount of . . . damages through this motion. If this motion is granted, then barring

settlement, the amount of damages would be established at trial." In other words, GAF

---

[8]     In its motion for summary adjudication, GAF did not address its claims for
specific performance and injunctive relief.

[9]     While this action was pending, GAF obtained two attachment orders against
Paramount. GAF relied on the attachment orders in its motion for summary
adjudication, noting that the trial court had already determined the probable validity of
its claim and rejected Paramount's mistake of fact defense. Such reliance is puzzling;
the court's attachment order specifically states, "The court does not determine whether
[GAF's] claim is actually valid; that determination will be made at trial and is not
affected by the decision on the application for the order." Indeed, the attachment statute
provides as much. (Code of Civ. Proc., § 484.050, subd. (b).) The trial court's order
granting summary adjudication states, as a section heading, "Judge Chalfant Found that
GAF's Claim Had Probable Validity and Granted GAF's Two Applications for
Prejudgment Attachment Against Paramount," although it includes no discussion under
that heading. To the extent the trial court stated this as a simple procedural fact, it was
correct; if the court relied on the prior holding in its summary adjudication analysis,
such reliance was improper.

sought summary adjudication on the issue of Paramount's *liability* for breach of contract, but not on the element of damages.[10] It also sought summary adjudication of several of Paramount's affirmative defenses, including, as relevant here, the defense of mistake of fact.

As to that defense, GAF argued that any mistake in using WTI as a proxy for the price of Oriente was a simple error in judgment by Paramount, as opposed to a mistake as to an existing fact. Further, GAF noted that Paramount was the party which had proposed the use of WTI, and Paramount had assumed the risk that WTI's price would not track Oriente's price. In this respect, it relied on the deposition testimony of Alan Moret, Paramount's person most qualified, who testified that he knew that WTI had the potential to deviate up or down with respect to the cost of Oriente.[11]

---

[10]     GAF argued that it would establish on summary adjudication that Paramount owed it *some* damages, but not the specific amount.

[11]     The question arises as to why the parties did not simply contract for a pricing formula based on Oriente's cost. According to Paramount, there was no market that published a daily price for Oriente. It further argued, "Paramount and GAF did not want a mechanism that would routinely require Paramount to provide GAF with crude purchase invoices to establish the price that Paramount had paid for the crude it used." Why Paramount would not want GAF to know its actual costs is easy to infer; why GAF would not want that mechanism is less clear. It could certainly be argued that it was Paramount's interest in keeping its costs (and therefore, profits) secret from GAF that prompted Paramount to decide to base its pricing formula on the price of another type of crude – even though there were risks inherent in using anything other than its actual costs in the formula. In other words, if Paramount priced its coating on a cost-plus basis, any savings it achieved by negotiating a cheaper price for Oriente would be passed on to GAF. However, by using a formula which assumed Oriente is $7.07 less per barrel than WTI, Paramount could retain the savings any time it obtained Oriente at a price more than $7.07 lower than WTI.

GAF also relied on an e-mail from Paramount during the negotiations of the agreement, in which Paramount first proposed using WTI Formula Pricing. The e-mail stated the following, "The pricing 'formula' has worked well when crude oil was less than $40 per barrel, however, when crude is over $60 per barrel, the formula does not work. With crude oil above $95 per barrel, the resulting 'formula' pricing absolutely does not and will not work.[12] For the fifteen years prior to 2005, the formula seemed to work as intended. Since 2005, we have not used the 'formula' price and it is likely not to come into play again for the foreseeable future. Therefore, the analysis and discussion is almost moot. That being said, it is our desire to come up with a fair 'formula' price, that could be used, if and when crude returns to a more 'normal' level. Because of the enormous difficulty and number of variables present, a fair, transparent and easily verifiable formula will be difficult." Paramount's e-mail went on to propose using WTI in the formula, stating, "WTI is quoted each and every day, is readily transparent, cannot be manipulated or influenced, is widely traded and is regularly used to hedge prices or positions, by hundreds of compan[ies]. This opens the possibility for GAF to hedge its costs in the future." The implication from this e-mail is that Paramount understood that risks were involved in adopting a formula pricing method,

---

**12** Interestingly, the record indicates that, from the start of the contract period until October 2008, when GAF requested to change from Asphalt Index Pricing to WTI Formula Pricing, the amount Paramount paid for Oriente exceeded $86.50 per barrel. The price dropped somewhat in October 2008, and in November 2008, it had dropped to $55.88 per barrel. In other words, GAF's behavior seemed in accord with the observations in this e-mail: formula pricing was desirable when the price per barrel was low, not when it was high.

12

and that it could have protected itself by writing into the contract a provision that WTI Formula Pricing would only be used under certain circumstances.

7.  *Paramount's Opposition*

As to the motion for summary adjudication on liability for breach of contract, Paramount argued this was procedurally improper, as summary adjudication could not be sought on a *portion* of a cause of action. Paramount also argued that triable issues of fact existed as to the elements of breach of contract.[13]  For example, Paramount noted that the contract provided for renegotiation of "an alternative formula basis" if WTI

---

[13]      GAF had sought summary adjudication on any affirmative defense Paramount raised which might be based on GAF's alleged antecedent breach of the contract, on the basis that Paramount never gave GAF notice of such breach and an opportunity to cure. Paramount argued that issues of GAF's performance were related not to its affirmative defenses but, instead, to the elements of GAF's breach of contract cause of action itself. In other words, Paramount argued that GAF had to prove its own performance in order to obtain damages for Paramount's breach; not that Paramount had to prove GAF's failure of performance as part of its affirmative defenses. The trial court apparently agreed, considering the issue with respect to GAF's cause of action, not Paramount's affirmative defenses. However, the court ruled that Paramount could not assert any non-performance of GAF, as it had failed to comply with the notice and opportunity to cure provisions. We are not certain of the correctness of this ruling. The notice and opportunity to cure provisions in the contract appear to refer only to whether a party can *terminate* the contract after an allegedly breaching party has been given an opportunity to cure such breach and has failed to do so. Paramount never sought to terminate the contract for GAF's breach; it is simply arguing that, as a factual matter, GAF cannot establish that it performed the contract. It is not at all clear that the notice and opportunity to cure provisions can even be relied upon to defeat a *defense* of a failure to perform. As we will ultimately conclude that the trial court committed procedural error in granting summary adjudication of the partial cause of action, GAF will be required to establish at trial all elements of its breach of contract cause of action, including its own performance. The issue of whether Paramount's failure to give notice of any alleged lack of GAF's performance constitutes a waiver of a defensive use of such lack remains an open one.

13

became "illiquid." Paramount argued that the Cushing glut caused WTI to become "illiquid," under certain financial definitions of liquidity.

As to the mistake of fact defense, Paramount argued that triable issues of fact existed as to whether the mistake in using WTI in the pricing formula had been a mistake of fact or an error in judgment. Specifically, Paramount argued that two mutual mistakes of then-existing fact had been made when the contract was negotiated in 2007: first, the parties did not know that then-existing technologies (including fracking) were then capable of accessing vast quantities of crude in the market area that depended on Cushing;[14] and second, that the parties did not know that the infrastructure at Cushing was unable to handle the extra oil.[15] Both of these facts made the eventual Cushing glut, and WTI's subsequent price drop relative to other oils, inevitable.

---

[14] Although Paramount submitted its expert's declaration regarding the cause and unanticipated nature of the Cushing glut, the expert at no point testified to this particular mistake of *fact*. He stated that the WTI pricing disruption "arose largely as a consequence of the unanticipated dramatic increase in crude oil production in the Midcontinent area . . . . " He added, "[i]n 2007 it was not anticipated that such an excess supply situation would arise." In other words, Paramount's expert did *not* testify either that: (1) those people who *were* aware of the then-existing capabilities of fracking did, in fact, anticipate the Cushing glut; or (2) *nobody*, in 2007, was aware of the then-existing capabilities of fracking. In short, Paramount's expert testified to a market disruption that "could not [have] been" anticipated. Although Paramount argues that, if it had known of the then-existing facts, it would not have entered into the contract with WTI Formula Pricing, it does not clearly explain how its purported mistake regarding then-existing facts would have led it to anticipate something its own expert claims could not have been anticipated. Putting it another way, an allegation that future behavior of a price index was *unforeseeable* "completely negates the notion of a mistake as to a material 'existing' fact." (*Wabash, Inc. v. Avnet, Inc.* (N.D. Ill. 1981) 516 F.Supp. 995, 999.)

[15] In its opposition to the summary adjudication motion, Paramount did not argue that the parties *did not know* of the limits of the infrastructure at Cushing. Instead, it

14

Paramount emphasized that, at the time of contracting, both parties had wanted a formula that tracked the price of Oriente. This was not a case of Paramount gambling on the price of WTI; it was, instead, both parties attempting to find a reasonable proxy for Oriente. Before entering into the agreement, Paramount had conducted research concerning the historical price movements of WTI and Oriente and had satisfied itself that WTI was a reasonable proxy for Oriente. Paramount argued that, although it had understood, at the time of contracting, that WTI's price would not always move in lock-step with Oriente's price, Paramount (and GAF) had never anticipated that WTI's price would actually become *lower* than Oriente's price.

8. *GAF's Reply*

In reply, GAF argued that it could, in fact, obtain summary adjudication on the issue of liability only. It further argued that, if it was incorrect on this point, it could obtain summary adjudication of two issues of duty – specifically, whether Paramount had a duty under the contract and whether it had breached that duty.

9. *The First Summary Adjudication Ruling*

After a hearing, the trial court denied GAF's motion in all respects. It specifically found triable issues of fact existed as to, among other things: (1) the interpretation of some ambiguous or implied contractual terms; (2) whether the contract

argued that the parties *did not consider* the Cushing infrastructure. Paramount stated, "Neither party realized that production gains were nearly certain to flood Cushing, so there was no concern about its outbound pipelines." In the instant writ proceeding, Paramount argues that the mistake was, in fact, in *not knowing* about the inadequacies of the infrastructure at Cushing, not that it did not consider the issue.

terms were performed or breached; and (3) which issues interrelate with Paramount's affirmative defenses.

      10.    *The Second Summary Adjudication Ruling*

More than two weeks later, the trial court issued an order vacating its initial ruling and stating that the matter stood submitted. Thereafter, it issued a new ruling granting GAF's motion for summary adjudication. The parties were not given an opportunity to provide further oral or written argument before such new ruling was issued.

As to GAF's cause of action for breach of contract, the court stated, "Paramount has breached the agreement by refusing to supply GAF with asphalt[] coating . . . at the contract price. Plaintiff has suffered damages when it was forced to purchase cover from Paramount and third parties in the amounts in excess of the parties' contract price. Therefore, Plaintiff's Motion for Summary Adjudication is granted for breach of contract . . . . " The court did not address Paramount's procedural argument that summary adjudication could not be granted on issues of liability alone, without calculating damages.

The trial court also granted summary adjudication in GAF's favor on several of Paramount's affirmative defenses. As to mutual mistake, the only affirmative defense at issue in the instant writ proceeding, the court concluded that Paramount's mistake of fact defense was, in fact, based on an error in judgment. In this regard, the court relied on the testimony of Moret that Paramount had been aware of the risk that WTI's price would not track the price of Oriente.

16

11.    *The Instant Petition*

Paramount filed a timely petition for writ of mandate, seeking review of the trial court's order.  As already indicated, we issued an order to show cause and set the matter for hearing.

## CONTENTIONS OF THE PARTIES

Paramount's petition focuses on three issues.  First, Paramount contends the trial court improperly reconsidered its summary adjudication ruling without granting the parties notice and an additional opportunity to be heard.  GAF responds that reconsideration was properly granted and, in any event, any error in granting reconsideration was necessarily harmless as the trial court's ultimate ruling was correct.  Second, Paramount argues that the trial court procedurally erred in granting summary adjudication on a portion of a cause of action (i.e., liability for breach of contract).  GAF responds that partial summary adjudication on liability only is proper and, in any event, the same result follows if the motion was characterized as seeking summary adjudication of issues of duty.  Third, Paramount argues that triable issues of fact existed as to whether its mistake of fact defense was based on a mistake of existing fact or an error in judgment.

## DISCUSSION

1.    *The Trial Court Erred in Granting Reconsideration*
       *Without Notice and a Hearing*

Our Supreme Court has clearly stated that a trial court has the inherent power to reconsider orders on its own motion "as long as it gives the parties notice that it may do

17

so and a reasonable opportunity to litigate the question." (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1097.) "To be fair to the parties, if the court is seriously concerned that one of its prior interim rulings might have been erroneous, and thus that it might want to reconsider that ruling on its own motion—something we think will happen rather rarely—it should inform the parties of this concern, solicit briefing, and hold a hearing." (*Id.* at p. 1108.) As the trial court in the instant case failed to do so,[16] the court erred.

GAF argues, however, that the error is not reversible if the trial court's ultimate ruling on the summary adjudication motion was substantively correct. We agree. "[T]he California Constitution requires that in any case in which a trial judge reconsiders an erroneous order, and enters a new order that is substantively correct, the resulting ruling must be affirmed regardless of any procedural error committed along the way." (*In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301, 1313.) We therefore turn to the merits of the trial court's ultimate order granting summary adjudication.[17]

---

[16]    GAF impliedly suggests that the court met this burden by giving notice that it would be reconsidering its initial ruling, "thereby giving Paramount sufficient time to request additional briefing or argument had it believed it was necessary." We disagree. The court's order had simply stated the prior order was "vacated and set aside" and that the motion "stands submitted." Stating that the prior order was "vacated and set aside" did not inform the parties of the court's concern that the prior ruling may have been erroneous; stating that the matter "stands submitted" did not constitute a solicitation of further briefing. Indeed, such an order compels the opposite conclusion.

[17]    See footnote 23, *post*.

2.      *Summary Adjudication of a Partial Cause of Action is Improper*

GAF sought, and obtained, summary adjudication of Paramount's liability for breach of contract, with the specific understanding that damages would be determined at trial. This result is not permitted by the language of the summary adjudication statute, the legislative history of the statute, and the case authority interpreting it.

"The objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citation.] We look first to the words of the statute, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. [Citation.] Significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided. [Citation.] Both the legislative history of a statute and the wider historical circumstances of its enactment may be considered in ascertaining legislative intent. [Citation.] Various extrinsic aids, including the history of the statute, committee reports and staff bill reports may be used to determine the intent of the Legislature, and such aids are especially helpful where the wording of the statute is unclear. [Citation.]" (*DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 418.)

Our initial investigation of the words of the statute is somewhat complicated by an unfortunate amendment intended to clarify the statute's language. We are concerned with Code of Civil Procedure, section 437c, subdivision (f)(1), which provides for motions for summary adjudication. It states, "A party may move for summary adjudication as to one or more causes of action within an action, one or more

19

affirmative defenses, one or more claims for damages, or one or more issues of duty, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or that there is no merit to an affirmative defense as to any cause of action, or both, or that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."

The preliminary problem arises because, technically speaking, the first sentence of the statute does not appear to allow a *plaintiff* to move for summary adjudication of a cause of action on the basis that the cause of action is indisputably meritorious. To see the problem, compare subdivision (a) of the same statute. This permits a party to move for summary judgment "in any action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) Thus, a plaintiff may move for summary *judgment* if it contends that "there is no defense to the action." A later subdivision explains that "[a] plaintiff . . . has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action." (Code Civ. Proc., § 437c, subd. (p)(1).) Thus, a plaintiff can seek summary judgment by contending there is "no defense" to the action, and it proves there is "no defense" by establishing every element of its causes of action.

There is, however, no provision for a plaintiff to move for summary adjudication of a cause of action if it proves there is "no defense" to the cause of action. Subdivision (f)(1) provides that a party may move for summary adjudication "if that party contends . . . that there is no *affirmative* defense" to a cause of action.[18] (Italics added.) But establishing that there is no affirmative defense to a cause of action does not establish the merits of that cause of action.[19] For the summary adjudication provision of the summary judgment statute to permit a plaintiff to seek summary adjudication of a cause of action, the statute should permit the plaintiff to seek summary adjudication if it contends that there is "no defense" to a cause of action.

This was, in fact, what was intended. Prior to a 1993 amendment, the summary adjudication provision provided, in language paralleling that of the summary judgment provision, that a party could move for summary adjudication "[i]f it is contended that one or more causes of action within an action has no merit or that there is no defense thereto . . . . " (Stats. 1992, ch. 1348, § 1.) In 1993, the subdivision was amended to read as it currently does, purportedly allowing a plaintiff to seek summary adjudication

---

[18]    If the party contends there is no affirmative defense to a cause of action, the statute is not entirely clear as to *what* the party should seek summary adjudication. If a party contends the affirmative defense has no merit, it can and should seek summary adjudication of the affirmative defense itself. The phrasing of the sentence seems to imply that a party can seek summary adjudication of *the cause of action* if it contends there is no affirmative defense to it, but, as we discuss, this is logically erroneous.

[19]    Indeed, consider the hypothetical of a cause of action against which a defendant interposes a general denial, but pleads no affirmative defenses. The plaintiff is not entitled to summary adjudication of the cause of action in its favor on the basis of defendant's answer alone. The lack of affirmative defenses says nothing about the merits of the cause of action, on which the plaintiff bears the burden of proof.

21

if it contends there is "no affirmative defense" to a cause of action, not if there is "no defense" to it.  (Stats. 1993, ch. 276, § 1.)  The legislative history confirms that this amendment was not intended, in any way, to change the bases on which a party could seek summary adjudication; instead, it was intended only to "[c]larify existing language relating to summary adjudication motions . . . . "  (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 498 (1993-1994 Reg. Sess.), as amended July 1, 1993, p. 2.)  Indeed, another division of this appellate district has already concluded that "despite the more awkward sentence structure of the 1993 amendment, we can only conclude that the first sentence of section 437c, subdivision (f)(1) was amended only to provide clarity and not to alter the meaning of the prior version of the sentence." (*DeCastro West Chodorow & Burns, Inc. v. Superior Court, supra,* 47 Cal.App.4th at p. 421 [rejecting the argument that the 1993 rephrase allowed parties to seek summary adjudication on a claim for damages other than punitive damages].)

Moreover, subdivision (p) of the summary judgment statute, which sets forth the standards of proof, begins with:  "For purposes of motions for summary judgment and *summary adjudication,*" (emphasis added), before proceeding to subdivision (p)(1), which describes the burden of establishing that "there is no defense to a cause of action."  The inclusion of "summary adjudication" in this subdivision would make no sense if a plaintiff could not, in fact, move for summary adjudication on the basis that there is no defense to a cause of action.

We therefore conclude that a plaintiff may, despite the confusing language of the statute, move for summary adjudication of a cause of action, if the plaintiff asserts there

is "no defense" to that cause of action. Further, the plaintiff's burden of proof on such a motion is defined by subdivision (p)(1) of Code of Civil Procedure, section 437c; the plaintiff must "prove[] each element of the cause of action entitling the party to judgment on that cause of action."[20]

With that established, we now proceed to the issue raised by the parties: may a plaintiff seek summary adjudication of liability only, leaving the resolution of damages to a later trial? The statutory language mandates the question be answered in the negative. A plaintiff can obtain summary adjudication of a cause of action only by proving "each element of the cause of action entitling the party to judgment on that cause of action." As damages are an element of a breach of contract cause of action (*Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 229), a plaintiff cannot obtain judgment on a breach of contract cause of action in an amount of damages to be determined later.

Legislative history is in accord. Prior to the 1990 amendment to the summary adjudication statute, parties could seek summary adjudication on any issues raised in a case. The 1990 amendment limited summary adjudication motions to: a cause of

---

[20] Paramount never contended that GAF could not seek summary adjudication of the entirety of its breach of contract cause of action. It was necessary, however, for us to make the digression into this issue in order to demonstrate that the burden of proof in subdivision (p)(1) of Code of Civil Procedure section 437c applied to GAF's motion. GAF argues that the use of the phrase "cause of action" in subdivision (f)(1) is ambiguous as to what it means for a plaintiff to move for summary adjudication of a cause of action. But, when considered together with the burden of proof in subdivision (p)(1), there is no ambiguity.

action, an affirmative defense, a claim for punitive damages, or an issue of duty.[21]

(Stats. 1990, ch. 1561, § 2.) The amendment was proposed by the California Judges Association, which took the position that "it is a waste of court time to attempt to resolve issues if the resolution of those issues will not result in summary adjudication of a cause of action or affirmative defense. Since the cause of action must still be tried, much of the same evidence will be reconsidered by the court at the time of trial."[22] (Senate Com. on Judiciary, Analysis of Sen. Bill No. 2594 (1989-1990 Reg. Sess.), as amended May 7, 1990, pp. 2-3.) The clear purpose of the amendment was to " 'stop the

---

[21] The 1993 amendment subsequently reinforced this, by adding the sentence stating, "A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Stats. 1993, ch. 276, § 1.)

[22] GAF argues that this purpose would be satisfied by allowing a plaintiff to move for summary adjudication on liability only, with damages left to be tried. GAF's own motion refutes this. GAF argued in its motion that, even if Paramount was correct on its mutual mistake defense, it would still be entitled to summary adjudication. GAF took the position that if there was a mistake as to WTI Formula Pricing, the severability clause would be triggered, and Paramount would therefore have been required to perform the contract under Asphalt Index Pricing. Thus, GAF argued that even if Paramount raised a triable issue of fact as to mutual mistake, GAF should still be granted summary adjudication on liability. GAF pursues this argument in this writ proceeding. But if GAF's argument is correct, it would obtain a summary adjudication order providing that Paramount was liable for breach of contract *either* by not performing under WTI Formula Pricing *or* by not performing under Asphalt Index Pricing. The subsequent trial would not simply involve a calculation of GAF's losses, as the trier of fact would be required to determine *whether* the WTI Formula Pricing term should, in fact, be considered severed as a result of mutual mistake of fact. Thus, all of the evidence considered by the trial court on whether there was a triable issue of fact on mutual mistake would have to be presented again at trial in order to determine the proper *measure* of GAF's damages. This is precisely the waste of time and judicial resources intended to be prohibited by the 1990 limitations on summary adjudication motions.

24

practice of adjudication of facts or adjudication of issues that do not completely dispose of a cause of action or a defense.' " (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1853.) A determination of liability alone does not completely dispose of the cause of action.

Case authority confirms this conclusion. In *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, the parties had filed cross motions for summary judgment; the plaintiff's was denied and the defendant's was granted. On appeal, the court reversed, concluding that the plaintiff's legal position was meritorious. However, the plaintiff had not established its damages. On appeal, the plaintiff requested the court of appeal to order the trial court to enter summary judgment in its favor. The court rejected the request, as follows: "The trial court had apparently ordered [plaintiff] to move for summary judgment on the issue of [defendant]'s liability, with damages to be determined in a later accounting proceeding. Although we have determined that [defendant] is liable to [plaintiff], Code of Civil Procedure section 437c makes no provision for a partial summary judgment as to liability. Even summary adjudication may be granted only in limited instances. (Code Civ. Proc., § 437c, subd. (f)(1).) Because issues of the calculation of damages apparently remain to be determined, it is not appropriate to grant summary judgment for appellant at this time. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1996) ¶ 10:40.1, p. 10-17 [summary judgment or adjudication improper where amount of damages raises factual issue].) The correct procedure below would have been a motion to bifurcate the issue of liability, which the parties could have tried upon the

undisputed facts. [Citation.] A decision on the issue of liability against the party on whom liability is sought to be imposed does not result in a judgment until the issue of damages is resolved." (*Department of Industrial Relations v. UI Video Stores, Inc., supra,* 55 Cal.App.4th at p. 1097.)

GAF takes the position that this case authority is not controlling. GAF argues that the court was discussing summary judgment, and that its language regarding summary adjudication was only a vague implication, bereft of analysis, in dicta. The confusion may have arisen because the court spoke of "partial summary judgment" and "summary adjudication" as two separate things. In truth, there is no such creature as "partial summary judgment" in California; the proper term is "summary adjudication." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group (rev. #1, 2013), ¶ 10:35, p. 10-7.) With this clarification, it is apparent that the court's language is a well-reasoned holding. The court was specifically requested to enter partial summary judgment—summary adjudication—on the issue of liability, leaving damages to be tried. The court rejected the request, because there was no statutory basis for such an order. As we have explained, the governing statute provides that a plaintiff can only obtain summary adjudication of a cause of action if the plaintiff establishes each element of the cause of action entitling it to judgment on that cause of action. The court specifically held that "[a] decision on the issue of liability against the party on whom liability is sought to be imposed does not result in a judgment until the issue of damages is resolved." (*Department of Industrial Relations v. UI Video Stores, Inc.,*

26

*supra,* 55 Cal.App.4th at p. 1097.) Therefore, such a summary adjudication would be improper. We fully agree with the court's reasoning.

GAF attempts to defend the trial court's ruling in its favor by recharacterizing it as a summary adjudication on issues of duty – specifically, that Paramount owed it a duty under the contract, and that it breached that duty. There are two reasons why this is incorrect. First, there is no statutory basis for summary adjudication on the issue of *breach*. We return to the language of Code of Civil Procedure, section 437c, subdivision (f)(1). "A party may move for summary adjudication as to . . . or one or more issues of duty, if that party contends . . . that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs." A plaintiff may seek summary adjudication on the existence or nonexistence of a contractual duty (*Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 519), but there is simply no statutory basis for an order summarily adjudicating that a party breached a duty. Second, to the extent GAF argues the trial court's summary adjudication order should be interpreted as a determination that Paramount owed it a contractual duty, we decline to do so on the basis that GAF did not move for such an order, but raised this issue for the first time in its reply memorandum. "[I]t is improper to grant summary adjudication absent a motion therefor. [Citations.] Therefore, because [defendant] did not move in the alternative for summary adjudication of specified issues, we will not address whether [defendant] may have prevailed on some issues in this case. [Citation.]" (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 949.)

27

In sum, there is no legal basis for a plaintiff's motion for summary adjudication on liability only, and the trial court erred in granting GAF's motion in this case.[23] We will therefore grant Paramount's writ petition to the extent it challenges the trial court's order granting GAF partial summary adjudication on its breach of contract cause of action.

3. *Summary Adjudication of Paramount's Mistake of Fact Defense Was Proper*

We now turn to GAF's motion for summary adjudication of Paramount's mutual mistake defense. We review the grant of summary adjudication de novo. (*King v. Wu* (2013) 218 Cal.App.4th 1211, 1213.)

"A contract may . . . be rescinded if the consent of the rescinding party was given by mistake. [Citation.] The party attempting to void the contract as a result of mistake must also show that it would suffer material harm if the agreement were enforced, though that need not be a pecuniary loss. [Citation.]" (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1332-1333 (*Habitat*).) "Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, [¶] 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." (Civ. Code, § 1577.)

---

[23] For this reason, the trial court's error in reconsidering its summary adjudication ruling without giving the parties notice and an opportunity to be heard was not harmless.

28

Civil Code section 1577 speaks in terms of mistakes as to *present* or *past* facts; there is no authority for rescission based on a mistake regarding *future* events. (*Mosher v. Mayacamas Corp.* (1989) 215 Cal.App.3d 1, 5 (*Mosher*).) In determining whether a mistake is a mistake of fact or an error in judgment, "[i]t is the facts surrounding the mistake, not the label, i.e., 'mistake of fact' or 'mistake of judgment,' which should control." (*White v. Berrenda Mesa Water Dist.* (1970) 7 Cal.App.3d 894, 907.)

According to Paramount, at the time of contracting, the parties were mutually mistaken[24] as to two then-existing facts: the capacity of existing fracking technology; and the lack of capacity at Cushing. These facts made the use of WTI in the pricing formula a bad choice, as they would, in the end, result in WTI's price eventually decoupling from that of Oriente, with disastrous results for Paramount.

Two California cases provide guidance in characterizing the mistake in the instant matter. The first is *Mosher*, in which the two parties had together owned properties in Lake Tahoe, and one party agreed to buy out the other. (*Mosher, supra,* 215 Cal.App.3d at p. 3.) The buyer stopped paying the agreed purchase price, and sought to rescind, when a change in federal tax law (eliminating tax benefits for secondary residences) drastically reduced the property values below the purchase price.

---

[24] GAF argues that any mistake was unilateral, on Paramount's part. Yet Paramount's witnesses testified that both parties had wanted stability in the pricing formula, and both parties agreed that WTI would provide the necessary level of stability. GAF questions the basis by which Paramount's witnesses knew what GAF's representatives were allegedly thinking. However, the record before this court does not indicate that GAF pursued any objections to Paramount's evidence on this basis. Thus, for the purposes of our consideration of the ruling on the summary adjudication motion, we assume Paramount is correct and both parties shared in the mistake.

29

(*Id.* at pp. 3-4.) The seller obtained summary judgment and the appellate court affirmed, over the buyer's contention of mutual mistake. The court explained that the buyer "asserts that the valuation of the Lake Tahoe properties which formed the basis of the 1982 contract was grossly overstated, an assertion which might raise a triable issue of fact were it supported by evidence that the valuation was overstated *at the time of the sale*. However, the entire thrust of [the buyer's] claim appears to be that the valuation was rendered mistaken *by subsequent events*, i.e., the adverse tax legislation which began affecting Lake Tahoe real estate in 1985 and was ultimately enacted in 1986, nearly four years after the parties' transaction." (*Id.* at p. 5.) The court continued, "Absent evidence that the existence of a future contingency (e.g., continuation of tax benefits) is an assumption of the contract (about which more in a moment), the defense of mistake of fact must be premised on past or present facts about which the parties are ignorant or mistaken. There was no evidence presented to the trial court that the valuation of the properties proposed by appellant itself in 1982 was erroneous in light of facts then or previously in existence." (*Ibid.*) As to the issue of whether the existence of future tax benefits was an assumption of the contract, the court concluded that there was no evidence that it was. The court explained that the buyer "chose to enter into the subject contract knowing that tax benefits were a major aspect of the value of the properties and presumably knowing that the availability of such benefits could be affected by future legislation, yet it made no provision with respect to tax matters in the contract which its own chief executive officer prepared." (*Id.* at p. 6.) In short, the

buyer's mistake was, as a matter of law, an error in judgment, not a mistake of fact. (*Ibid.*)

Just as the buyer in *Mosher* was not mistaken about the value of the properties at the time of the contract, Paramount was not mistaken regarding the value of WTI at the time it entered into the contract at issue in this case. The *Mosher* buyer was mistaken as to whether the then-existing tax benefits would continue; Paramount was mistaken as to whether the then-existing correlation in price between WTI and Oriente would continue. The *Mosher* buyer could have protected itself by providing in the contract that the price depended on the continuation of tax benefits, but failed to do so; Paramount could have protected itself by providing that the continued use of WTI Formula Pricing depended on the continuation of the price relationship between WTI and Oriente, but failed to do so. As the facts are similar, the *Mosher* result should govern; Paramount's mistake was an error in judgment.

There is one sentence in *Mosher* on which Paramount can attempt to distinguish its situation. *Mosher* states that the buyer entered into the contract "presumably knowing that the availability of [tax] benefits could be affected by future legislation." (*Mosher, supra,* 215 Cal.App.3d at p. 6.) Paramount argues that, in contrast, it did not know that the price correlation between WTI and Oriente could be affected by then-existing fracking technology and therefore could not have contracted to protect itself. But Paramount *did* know that there was always a risk that WTI and Oriente

31

would not continue to track;[25] indeed, it conducted a great deal of research to assure itself that the past behavior of the two prices had stayed within a reasonable range, from which it made the assumption that it was likely that the two would remain relatively in sync. But there were no guarantees that past pricing relationships would continue (for whatever reason) and Paramount did nothing to protect itself from such a contingency.

The second case from which we obtain guidance is *Habitat*, a case in which a developer sought to develop a residential subdivision. The draft environmental impact report (EIR) proposed that, in order to mitigate the potential loss of a habitat for plants and animals, the developer should convey some off-site land to a County Special District. A non-profit environmental advocacy group found this mitigation provision to be insufficient, and intended to oppose the development. (*Id.* at p. 1312.) The developer and the non-profit then reached an agreement that the non-profit would not oppose the development if, rather than conveying the mitigation land to the County, the developer conveyed the mitigation land to the non-profit itself. (*Id.* at pp. 1312-1313.) The final, approved, EIR provided that the developer must convey the mitigation land to the County or " 'other qualified conservation entity approved by the City.' " (*Id.* at p. 1313.) The developer contracted to give the mitigation land to the non-profit, and the parties sought City approval of the non-profit as a "qualified conservation entity." (*Id.*

---

[25]  Indeed, Paramount knew the risks enough to include a contract term that the price would be renegotiated if WTI was no longer quoted or became illiquid. Surely if Paramount realized the possibility that WTI *could become illiquid*, while Oriente would still be available, it recognized that WTI would not necessarily always track Oriente's price.

at p. 1314.)  The non-profit failed to obtain City approval, but nonetheless sued the developer for failing to transfer the land.  (*Id.* at p. 1315.)  The developer sought to rescind the contract with the non-profit, on the basis of mutual mistake.  (*Id.* at p. 1317.)  The developer successfully obtained summary judgment, and the judgment was affirmed on the non-profit's appeal.  It was clear from the facts that the contract between the developer and the non-profit was based on the assumption that the non-profit would be approved by the City as a "qualified conservation entity," although the contract did not specify this.  The issue arose as to whether the parties' mistake was a mistake in judgment that the City *would approve* the non-profit, or a mistake in fact that the non-profit *met the necessary qualifications*.  (*Id.* at p. 1343.)  The court concluded that, despite the non-profit's characterization of the mistake as one regarding future approval, the facts showed that both parties were mistaken "as to the present fact that [the non-profit] would qualify."  (*Ibid.*)

The *Habitat* opinion illustrates the ease with which a mistake can be characterized as either a mistake of fact or an error in judgment.  But, further, it demonstrates what it is to be mistaken about a present fact, even though it was a future occurrence of an unexpected event that derailed the contract.  That is, in *Habitat*, the contract depended upon the City ultimately approving the non-profit to take the mitigation land; it was the *future* event of the City's disapproval of the non-profit that undermined the developer's reason for entering into the contract with the non-profit.  However, the parties had entered into the contract with the *present* understanding that the non-profit met the requirements of a qualified conservation entity, and would

33

therefore be approved as a matter of course. The mistake was not a failure to predict the City's exercise of its discretion, but a mistake in understanding the qualities of the non-profit itself. *Mosher* provided an illustration of the distinction. When two parties agree to the sale of a violin believed to be a Stradivarius, they can rescind the contract when the violin is discovered to be a fake. This is because the violin *never was* what the parties believed it to be. (*Mosher, supra,* 235 Cal.App.3d at p. 5.) Similarly, in *Habitat*, the non-profit *never was* the qualified conservation entity it was believed to be.

In this case, there was no such factual mistake. WTI oil, on which the parties relied for the formula pricing alternative, was, in fact, exactly what the parties believed it to be. The then-existing capacity at Cushing was also what the parties believed it to be. There is no suggestion, for example, that *at the time of contracting*, the Cushing glut existed and the parties were mistaken about it. Instead, the parties were mistaken in their assumption that WTI would continue to serve as a reasonable proxy for Oriente. This is, as a matter of law, an error in judgment. While Paramount, with the benefit of hindsight, attempts to find facts existing at the time of contracting which could be blamed for eventually causing WTI's price to decouple from Oriente's,[26] this does not

---

[26] We note that *any* failure to predict events based on human behavior can, with enough creativity, be attributed to a failure to know then-existing facts. The buyer in *Mosher* presumably did not anticipate the change in tax law because he failed to know the then-existing tax philosophy of President Reagan. There is, of course, a causal problem with such arguments – as they focus on facts more and more distant from the actual event which frustrated the contract. Even though the President might be favorably disposed toward a tax change, the change will not go into effect unless Congress passes the necessary legislation. Thus, the mistake *truly* was in not predicting the future occurrence. Paramount's argument suffers from a similar causal problem. Paramount argues that it was not aware that then-existing fracking technologies were

34

change the fact that it was Paramount's failure to predict the future results of these facts, not its failure to know them,[27] which was the true nature of the mistake in this case. The trial court did not err in granting GAF's motion for summary adjudication of Paramount's mistake of fact defense.

---

*capable* of extracting large amounts of oil. But even though technologies are capable of extracting large amounts of oil, that oil will not be extracted unless the oil companies obtain the rights to extract the oil, the existing regulatory environment allows the extraction, and the companies believe that it will be profitable to actually choose to extract the oil at that time. Thus, the mistake *truly* was in not predicting that oil companies *would* extract vast amounts of oil via fracking.

[27] Tellingly, at one point in its briefing, Paramount argues, "the parties simply made a mistake with respect to how existing facts would inevitably prevent a WTI-based pricing formula from tracking the price of Oriente crude that Paramount was using." This is a failure to predict the future, not a failure to know the facts. Were Paramount correct, no futures or long-term performance contract would be safe. Suppose Paramount and GAF had contracted not for asphalt coating made from Oriente, but for WTI futures at a fixed price. When the price of WTI substantially and unexpectedly dropped due to the Cushing glut, the buyer (who would then have to pay a much higher price for WTI than its market price) would not be heard to complain that there had been a mutual mistake in that the parties failed to predict that conditions would result in the Cushing glut and the drop in price of WTI. The result must be the same when the parties did not contract for WTI futures, but based their pricing structure on the future price of WTI. Paramount argues that this is unfair, in that the parties had not *intended* to gamble on the price of WTI and had, instead, chosen to use WTI Formula Pricing because of the presumed stability of the price of WTI with respect to the price of Oriente. Unfortunately, however, Paramount built no protections into the contract to protect it from such WTI price fluctuations (as GAF did), but, instead, agreed that WTI Formula Pricing would be used regardless of future contingencies.

*DISPOSITION*

The petition for writ of mandate is granted in part and denied in part. Let a peremptory writ of mandate issue directing the trial court to vacate its order granting GAF's motion for summary adjudication in its entirety and to issue a new and different order: (1) denying GAF's motion for summary adjudication of the liability portion of its cause of action for breach of contract; and (2) granting GAF's motion for summary adjudication of the identified affirmative defenses,[28] including mutual mistake. The parties shall bear their own costs in connection with this petition.

***CERTIFIED FOR PUBLICATION***

CROSKEY, J.

WE CONCUR:

KLEIN, P. J.                          KITCHING, J.

---

[28] These affirmative defenses are mistake of fact, commercial frustration, impossibility, and impracticability. To the extent that the trial court may have granted summary adjudication of Paramount's "affirmative defenses" based on GAF's purported failure of performance, this was error. There were no affirmative defenses pleaded based on GAF's purported failure of performance. Instead, Paramount's arguments that GAF failed to perform were arguments that GAF could not establish the performance element of its own breach of contract cause of action. (See footnote 13, *ante*.) As these arguments went to a general, not an affirmative, defense, they were an inappropriate basis on which to grant summary adjudication.