Filed 6/18/15  Moradzadeh v. Casiano Bel Air HOA CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DAVID MORADZADEH, | B252067 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC443807) |
| v. | |
| THE CASIANO-BEL AIR HOMEOWNERS ASSOCIATION, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Maria E. Stratton, Judge.  Reversed and remanded.

Tesser Ruttenberg & Grossman, Kenneth G. Ruttenberg; Benedon & Serlin, Gerald M. Serlin, Wendy S. Albers, for Plaintiff and Appellant.

Musick, Peeler & Garrett, William A. Bossen, Cheryl A. Orr, Alex H. Aharonian, for Defendant and Appellant.

_____

Plaintiff and appellant David Moradzadeh appeals from the judgment following an order granting summary judgment in favor of defendant and respondent The Casiano-Bel Air Homeowners Association in this action concerning the maintenance of hillside slopes adjacent to a housing development. Moradzadeh contends triable issues of fact exist as to whether he was aware of the Association's failure to maintain the slope more than five years prior to filing his lawsuit. He additionally contends the trial court should have granted his motion for summary adjudication on the issue of whether the Association had a duty to maintain and repair the slope adjoining his property.

The Association appeals also from the judgment. The Association contends the trial court should have granted its first motion for summary judgment on the grounds that it had no duty to maintain the hillside slope, and interpretation of the relevant documents to impose a duty would make them unenforceable, impose an unconscionable burden on the homeowners, and render them void from inception as an illegal contract. In addition, the Association contends the trial court abused its discretion in evidentiary rulings.

We conclude the Association failed to meet its burden on summary judgment to show Moradzadeh made a demand for performance prior to January 24, 2003, which triggered the statute of limitations. The trial court also should have granted Moradzadeh's motion for summary adjudication on the issue of duty and found the Association had a duty to enter into contracts and other arrangements for the maintenance and repair of the slope at issue. This interpretation of the relevant documents does not require the Association to take any illegal action. The trial court properly found triable issues of fact exist as to the Association's defenses to enforcement. We reverse and remand for further proceedings.

# FACTS AND PROCEDURAL HISTORY

## Undisputed Facts

In September 1971, the owners of hillside property entered into escrow instructions to sell Tract 25625 to Casiano Estates for development. According to the escrow instructions, the sale was subject to approval of a subdivision map for up to 42 lots. The escrow instructions state that the owner "will give buyer access to property owned by seller and adjoining the property being purchased by buyer, and will grant to buyer slope rights on and easements through said adjoining property, as necessary for development of the property being purchased."

The City of Los Angeles approved a subdivision map for Tract 25625, subject to arrangements for the repair and maintenance of "offsite" fill slopes adjoining Tract 25625 and the establishment of easement grants providing access to various portions of the adjoining property to be maintained.

In 1974, developer Casiano-Bel Air Development Co. adopted and recorded articles of incorporation, bylaws, and a declaration of covenants, conditions and restrictions (CC&Rs) for Tract 25625. Exhibit A of the CC&Rs describes an area adjacent to the development, which includes the slope adjacent to Moradzadeh's property. Exhibit B of the CC&Rs describes an area within the development.

The CC&Rs state the developer's intent to preserve the value of the property and any additions by creating a corporation with the power to maintain the slope areas of the property and additions, administer security protection, and enforce the CC&Rs. In addition to the original property, if the developer developed additional property in the area described by Exhibit A within a certain number of years, the developer could annex the addition and bring it within the general plan and scheme of the CC&Rs without approval of the Association, its directors or members. The developer did not develop any addition to the original property.

The CC&Rs provide for annual assessments. The assessments are to be used exclusively to provide for the recreation, health and safety of the Association's members, "including the establishment and maintenance of facilities and personnel for the protection of persons and property within the Project and for the improvement, maintenance, irrigation, repair and upkeep of the slope areas of The Project described in Exhibit 'B' attached hereto and made a part hereof by this reference."

Article VIII of the CC&Rs describes the duties and powers of the Association. The Association will: "(a) Maintain, or cause to be maintained, the slope areas more particularly described in Exhibit 'B' ('Slope Control Areas') and all landscaping thereon, as originally approved by Developer, . . . in such a manner as enhance their appearance and to preserve established slope ratios, prevent erosion and sliding problems, and facilitate the orderly discharge of water through established drainage systems; [¶] . . . [¶] . . . [¶] . . . [¶] . . . (f) Enter into contracts or other arrangements with any person, firm, association, corporation, municipality, body politic, county, state or government, conducive to the purpose of the Association, including the improvement, maintenance, irrigation, repair and upkeep of slope areas located within the property more particularly described in Exhibit 'A' attached hereto and incorporated herein by reference, or within the property adjacent to The Project."

The CC&Rs provides easements for the "Slope Control Area": "There shall be granted to the Association easements over the Lots as more particularly shown and described in Exhibit 'B', attached hereto and incorporated herein by reference, for maintenance purposes as more particularly set forth in Article VIII, Section 1(a) hereinabove."

The developer apparently executed a grant of easements to the Association that was recorded in 1974. The developer granted the Association "an easement in perpetuity for ingress and egress for itself, its agents, servants and employees and for equipment for the maintenance, repair, irrigation and planting of the slopes and for the maintenance of the sprinkler system and the pipes for irrigation of the slopes on, over, across and unto certain portions of Tract 25625 and the slopes adjacent thereto."

4

The developer constructed the Casiano-Bel Air Development, which is a planned housing tract of 42 residential lots on Tract 25625. Thirty-three of the lots abut downhill slopes that are outside the development.

In 1981, Louis Share, Herbert Weiser, and Marvin Uritz owned property in the development. They demanded the Association repair conditions in the Exhibit A slope areas adjacent to their properties. The Association declined to conduct repairs, in part on the ground that no easement had been conveyed to the Association providing access to the downslope property outside the boundary of the development.

Share, Weiser, and Uritz contacted the original property owners and requested easements over the property described in Exhibit A of the CC&Rs. The owners executed a grant of easements in 1982. The document stated that the owners agreed to execute the grant of easements "[p]ursuant to its commitment made on or about September 24, 1971, and in order to provide legal access to the Association to the slope areas being located on that real property described in Exhibit 'A' to the Declaration." Based on these facts, the owners granted the Association and its successors an easement in perpetuity for specific activities, including maintenance and repair of the slopes adjoining four specific parcels.

Share, Weiser, and Uritz filed an action against several defendants, including the Association, for an injunction, specific performance, declaratory relief and damages in connection with slope maintenance and repair. In an interlocutory order, the trial court found the Association had a duty to maintain and repair the slope areas on and adjacent to the development as set forth in Article VIII, subdivisions (a) through (f). The parties entered into a settlement in which the Association agreed to maintain and repair particular slopes in Exhibit A property that were adjacent to the plaintiffs' property and covered by the 1982 grant of easements.

In August 1988, the Exhibit A property had a new owner. The new owner granted title to the property to the State of California, acting through the Santa Monica Mountains Conservancy, subject to specific easements.

5

On December 30, 2002, Moradzadeh's mother signed a deed granting her lot in the development to Moradzadeh. The deed was recorded on February 11, 2003. Moradzadeh joined the Association's board of directors in April 2005.

At a board meeting on April 12, 2005, the board members discussed dissolution of the Association. Moradzadeh was in favor of dissolution, while Uritz was opposed. Uritz explained there had been a hillside controversy in the community for many years. The owners of inside lots questioned why they had any liability to maintain the manufactured hills. He added, "No homeowner living over the manufactured hill in their right mind is going to walk away from what he has when he bought his house."

Moradzadeh responded, "Well[,] you are incorrect on that statement because I have a manufactured hill, I have been originally taken care of by the Association, and all the documentation I have when I sat down with my attorney and coming to you and this association for 8 years my hillside has been completely neglected and it's a liability to me because the Association has not been taking care of my hillside so there is a third prong to your [-]" Uritz interrupted Moradzadeh before he could finish.

Board member Shel Bachrach wondered if the Association would continue to have liability for the slopes even if the Association dissolved. He suggested the Association confer with an attorney. Uritz reminded Moradzadeh that the newly elected board members would consider Moradzadeh's property issues. He added, "From what I understand or remember there is some problems with your property[.] I don't know what they are . . ." Moradzadeh responded, "You have been ignoring them for eight years."

There was a discussion of the amount spent each year for the past 15 years to maintain the manufactured hills, including brush clearance. Bachrach asked for the name of the landscaper, so he could request a price to clear the brush for every home. Uritz replied that the landscaper's contract expired. He claimed the landscaper began clearing Moradzadeh's hillside in the past year, but did very little work. Moradzadeh interjected that no one had cleaned his hillside. Uritz explained that the landscaper did very little work, rain started, and he refused to work on the hillside, but he continually promised to start again. Bachrach asked to see the contract and the scope of the work.

6

There was additional discussion about whether dissolving the Association would place responsibility for hillside maintenance on the Conservancy. Moradzadeh and Uritz agreed that if the CC&Rs did not exist, there would be no liability for the slopes. Bachrach asked what would happen in the event of a slope failure. Moradzadeh responded, "This is one of the things I have been [talking] to my attorney about, the whole condition [it] is in and the scare tactics that that property [manager] used in our last meeting, if it was to slide, which is why I want the geologist report, which I have been told states that our hillside is in the best condition possible, and if the majority votes to remove [the slope liability]."

Bachrach agreed the Association should get a geologist's report. He would feel more comfortable if a geologist set forth exactly the measures to be taken for different slopes to put them in the best possible condition. If the Association agreed to dissolve at that point, it could explain the steps that were taken and the expert's opinions. Uritz insisted that he would never accept such actions, and no one in their right mind would. Moradzadeh stated emphatically that he would.

Bachrach later stated, "[Uritz,] if my hill had a problem and this homeowner association dissolves I have a house worth x dollars[,] you think I am honestly going to let it go down the hill? No[,] I am going to spend the money to take care of it." Moradzadeh added, "Let me just put things in perspective again[. My] hillside is the first one to go down the hill and my mother and I have been part of this Association for a very long time and you keep [talking] about how you maintain the hillside . . . and it just has not been done. And I again want this written in the minutes[, a nearby homeowner's association] has been there just as long or longer than we have and they have the same manufactured hills that we do the whole issue about someone getting a geology report to maintain a concrete swale does not exist." Bachrach suggested, "[Let's] first find out what problems we have with the manufactured slopes [-] how much does it cost to put it in the best shape possible." Uritz responded that he had talked to people on the manufactured hills and they believed as he did. Moradzadeh disagreed.

7

Landscaper Alex Diaz viewed the development with Moradzadeh and another board member. On May 25, 2005, Diaz provided an estimate to Moradzadeh, Bachman, and another board member to clear brush and fallen trees. In addition, Diaz would repair the hillside erosion "slippage" affecting Moradzadeh's property with a block retaining wall. He would also repair a chain link fence and sprinklers.

Minutes of a board meeting held on June 7, 2005, state that the Association received two bids. The scope of the work was removal of all dead brush from the hillside from the end of the homeowner's property to the beginning of conservancy property continuing down the hillside 200 feet, and repair of any areas that have "slippage" affecting homes in the development or other hillside problems to the best condition possible. The Association accepted Diaz's bid. Diaz later explained in his deposition that the retaining wall was erected to support Moradzadeh's property, because it showed the most erosion.

On December 27, 2007, Moradzadeh sent the Association's attorney a request for resolution or demand for mediation concerning maintenance and repair of the hillside slope adjacent to his property. He stated that after years of attempting to obtain a commitment from the Association to maintain and repair the slope, he was forced to initiate legal proceedings. On January 16, 2008, the Association's attorney replied that the Association was agreeable to non-binding mediation. Mediation sessions were conducted on May 15, 2008, and July 20, 2010, without resolution of the matter.

**Complaint**

On August 16, 2010, Moradzadeh filed a complaint against the Association, Casiano Estates Homeowners Association, and the Conservancy. On December 9, 2010, Moradzadeh filed an amended complaint for breach of contract, negligence, nuisance, an injunction and declaratory relief. The complaint alleged as follows. During the last several years, the slope below and adjoining Moradzadeh's property has been failing. Most of the failing portion of the slope is owned by the Conservancy, with the remainder

8

owned by Moradzadeh. Prior to and during the Conservancy's ownership of the property, the Association made unsuccessful attempts to repair the subsidence of the property, but had recently decided not to take further responsibility to repair or maintain the slope. Moradzadeh attempted to cause the Association and the Conservancy to take responsibility for an acceptable repair and stabilization of the slope, but both have failed and refused.

Moradzadeh attempted to cause: the Association to relieve itself from liability for slope maintenance by giving responsibility back to the Conservancy; the Conservancy to maintain and repair its own land; and the Association to honor its obligations under the governing documents, agreements and court judgment. The Association has refused to protect its own interests concerning the obligations for slopes, make necessary repairs to stabilize the slopes permanently, and file legal action against responsible parties, including Uritz and Share, whose breach of fiduciary duty caused the Association to have continuing liability for land it does not own to maintain and repair the slopes of past board members, but not other Association members.

Prior to 2006, the Association took actions to mitigate the slope failure. The Association installed telephone poles and had a retaining wall built on the slope located on the Conservancy's property. On October 13, 2006, Moradzadeh wrote the Association that the proper way to resolve the slope issue was to obtain the services of a geologic consultant and obtain bids from contractors to perform the work addressed in the geologic reports.

Moradzadeh alleged the Association breached its contractual duties and its duty of care to members, because it was required and failed to: maintain the slopes in a safe and stable condition; repair the slopes to remain stable permanently; extricate itself from maintenance and repair obligations for portions of the slopes that members do not own or are not contiguous to the property of the development; and purchase and maintain earth movement insurance. Moradzadeh sought a declaration to determine the parties' rights and responsibilities, injunctive relief, and $300,000 in compensatory damages, based on informal estimates to repair and stabilize his slope.

9

Casiano Estates and the Conservancy were dismissed in January 2011.

**The Association's First Motion for Summary Judgment**

In November 2011, the Association filed a motion for summary judgment on the ground that it did not owe a duty to maintain the slopes at issue because they were outside the development, the CC&Rs were not enforceable because the development was not a "common interest development," and Moradzadeh's position was unconscionable and would render the CC&Rs void for illegality, because it would require the Association to trespass on the land described in Exhibit A. The trial court denied the motion, finding triable issues of material fact existed.

**Moradzadeh's Motion for Summary Adjudication**

In November 2012, Moradzadeh filed a motion for summary adjudication of the issue of the Association's duty to maintain and repair the slope adjacent to his property as described in his declaratory relief cause of action. The trial court denied the motion on the ground that multiple duties were alleged in the cause of action, so the motion did not completely dispose of the issue of duty, and triable issues of fact existed because the Association did not own the slope.

**The Association's Second Motion for Summary Judgment**

In March 2013, the Association filed a second motion for summary judgment on the ground that Moradzadeh's claims were barred by the five-year statute of limitations for violation of a restrictive covenant provided in Code of Civil Procedure section 336, subdivision (b). The Association asserted Moradzadeh knew the slopes adjacent to his property had experienced erosion, which the Association had not repaired, no later than the date of the board meeting on April 12, 2005, which was more than five years prior to

10

his filing his complaint on August 16, 2010. In fact, the Association argued, Moradzadeh was aware of the slope issues prior to acquiring title in 2002.

Moradzadeh opposed the motion for summary judgment on the ground that even if he was aware of the Association's failure to maintain the slope in April 2005, the statute of limitations was tolled during the mediation process from December 28, 2007, through July 20, 2010. He submitted documents as to the undisputed facts above, as well as a notice to homeowners showing the board of directors hired a landscaper in 2005 to remove debris to avoid the risk of fire and slope failure, which had accumulated as a result of past neglect. He also submitted documents to show the timing of the mediation proceedings.

The Association filed a reply conceding that the statute of limitations had been tolled during mediation, but arguing the limitation period started to run on December 30, 2002, when Moradzadeh's mother executed the deed granting him title. The Association relied entirely on Moradzadeh's statements at the April 12, 2005 board meeting to show that he was aware of slope failure and neglect.

A hearing was held on June 3, 2013. Moradzadeh sought to introduce additional evidence that the Association misinterpreted his comments at the board meeting and presented them out of context. The trial court allowed the parties to brief the issue of whether Moradzadeh should be permitted to submit supplemental evidence. On August 5, 2014, the trial court denied Moradzadeh's request to submit supplemental evidence and granted the motion for summary judgment. The court found it was undisputed that Moradzadeh acquired title on December 30, 2002. The April 12, 2005 board meeting minutes reflected Moradzadeh was aware of slope erosion affecting his property, because he and his mother had complained of it for the past eight years. The court found it to be clear that he was referring to slope erosion when he made this statement, not brush clearance. The court entered judgment in favor of the Association on August 19, 2013. Moradzadeh filed a timely notice of appeal from the judgment.

11

## DISCUSSION

### Standard of Review

"Summary judgment is appropriate when all of the papers submitted show there are no triable issues of any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) . . . [¶] A defendant may move for summary judgment if the action has no merit. ([Code Civ. Proc.,] § 437c, subd. (a).) A defendant meets the initial burden of showing a cause of action is without merit if the defendant shows that one or more elements of the cause of action cannot be established or, as in this case, there is a complete defense to a cause of action or the complaint. (*Id.* subd. (p)(2).) Once the defendant makes such a showing, the burden shifts to the plaintiff to produce evidence demonstrating the existence of a triable issue of material fact. [Citations.]" (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 444 (*Minish*).)

"On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601.) 'We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards.' (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373.) We apply the same three-step analysis required of the trial court. First, we identify the issues framed by the operative complaint and answer since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing establishes facts which negate the opponent's claim and justifies a judgment in the moving party's favor. When the moving party makes a prima facie showing, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Hamburg v. Wal–Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503.)" (*Minish*, *supra*, 214 Cal.App.4th at p. 444.)

12

"In performing these steps, we view the evidence in the light most favorable to the party opposing the motion; and we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64, 74; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)" (*Minish*, *supra*, 214 Cal.App.4th at p. 444.)

## Statute of Limitations

Moradzadeh contends triable issues of fact exist as to when he learned of the slope failure and the Association's refusal to provide for maintenance and repair. We agree.

In the trial court, the Association argued that Moradzadeh's claims were governed by the five-year statute of limitations under Code of Civil Procedure section 336 for violation of a restrictive covenant, as defined in Civil Code section 784. On appeal, the Association contends the claims are subject to the four-year statute of limitations for actions on a written instrument under Code of Civil Procedure, section 337, or the three-year statute of limitations for injury to real property under Code of Civil Procedure, section 338, subdivision (b). The Association was right the first time. Violation of a covenant is governed by the five-year statute of limitations set forth in Code of Civil Procedure section 336, subdivision (b). (*Pacific Hills Homeowners Ass'n v. Prun* (2008) 160 Cal.App.4th 1557, 1563-1564; 8 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 24:29.) Moradzadeh's claim must have accrued before January 24, 2003, to be barred by the statute of limitations.

"[T]he statute of limitations to enforce affirmative covenants running with the land, and, in particular, duties included in a declaration of CC&R's, commences when a demand for performance is made." (*Cutujian v. Benedict Hills Estates Assn.* (1996) 41 Cal.App.4th 1379, 1387.)

The evidence submitted by the Association did not establish that Moradzadeh made a demand to the Association to repair the current slope failure prior to January 24,

13

2003. The Association relies on the minutes of the April 2005 board meeting, but the trial court failed to strictly construe the moving party's evidence and resolve all doubts in favor of Moradzadeh.

Moradzadeh's statements in the meeting are vague, incomplete, and nearly unintelligible. The discussion concerned a proposal to dissolve the Association to avoid liability for slope maintenance, which Moradzadeh advocated. Moradzadeh's position is not consistent with a demand to the Association to maintain and repair his hillside. Moradzadeh said the Association originally took care of him. He states he has been coming to the Association for eight years. It is unclear whether this meant he attended meetings for eight years or had asked for some action from the Association for eight years. He was the record owner for less than three years. We cannot conclude from this one ambiguous sentence that Moradzadeh made a demand to the Association to maintain and repair a slope failure eight years earlier in 1997.

Moradzadeh says his hillside has been completely neglected and it is a liability to him, because the Association has not been taking care of his hillside, but it is not clear what liability issue he refers to. There is a discussion of brush clearance on the hillside, which Uritz claims was performed and Moradzadeh disputes. Moradzadeh's statement about coming to the Association for eight years about his hillside is susceptible to the interpretation that he was referring to brush clearance. We must resolve any doubts in favor of Moradzadeh.

When the potential for slope failure is raised later in the meeting, Moradzadeh refers to a property manager's statements as "scare tactics." He believes a geologist's report states that the hillside is in the best condition possible. In response to a hypothetical, he states that his house would be the first to collapse if there were a slope failure. A trier of fact could reasonably conclude from Moradzadeh's statements and his position during the meeting that he was not aware of a slope failure threatening his property. If he believed his property were in danger from a slope failure, it would not be in his interest to encourage the Association to avoid liability and put the responsibility for repairs back on the individual homeowners. He disputes that the Association has

14

maintained his hillside, but he never states that the slope adjacent to his house is failing or demands the Association take corrective action. The April 2005 minutes alone are insufficient to find Moradzadeh made a demand for maintenance and repair of the slope issue in this case prior to January 24, 2003.

The evidence shows that after the April 2005 meeting, the Association paid a substantial sum for brush clearance and installation of a retaining wall to support the slope adjacent to Moradzadeh's property. As a board member, Moradzadeh arranged for the contractor's inspection of the property and approval of the contractor's bid. The express intent of the work was to ensure the slopes were in the best condition possible. There is no evidence Moradzadeh was dissatisfied with the repairs provided. To the extent it can be inferred from the minutes that Moradzadeh asked the Association to provide slope maintenance and repairs prior to April 2005, the evidence shows the Association fully complied by providing the maintenance and repair work requested under Moradzadeh's direction. The Association remedied the conditions in 2005 to the satisfaction of the parties by providing maintenance and repairs arranged directly by Moradzadeh as a board member. The Association's evidence was not sufficient to establish that Moradzadeh demanded repair of the slope failure at issue in this action prior to the written demand on December 27, 2007. The Association did not meet its burden on summary judgment and the motion should have been denied.


**Duty of the Association to Maintain and Repair the Adjacent Slope**


Moradzadeh contends the trial court should have granted his motion for summary adjudication by finding the Association has a duty to maintain and repair the slope adjacent to his property. He contends that the trial court erred by denying the motion on the ground that it would not resolve an entire cause of action or completely resolve the issue of duty. The Association agrees the issue of the duty to maintain and repair the slope may be resolved by summary judgment, because the Association contends the trial court should have granted its first motion for summary judgment by finding the CC&Rs

15

do not create a duty to maintain the land described in Exhibit A. We agree that the duty issue may be resolved by summary judgment, and we conclude the Association had a duty to its members as set forth in the CC&Rs.

Code of Civil Procedure, section 437c, subdivision (f)(1), provides that "[a] party may move for summary adjudication as to one or more causes of action within an action, . . ., or one or more issues of duty, if that party contends . . . that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."

"A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties under a written instrument and requests that these rights and duties be adjudged by the court." (*Hollenbeck Lodge (486) 1.0.0.F. v. Wilshire Boulevard Temple* (1959) 175 Cal.App.2d 469, 476, quoting *Maguire v. Hibernia Sav. & Loan Soc.* (1944) 23 Cal.2d 719, 728.)

The trial court, "on a motion for summary adjudication, . . . may rule whether a defendant owes or does not owe a duty to plaintiff without regard for the dispositive effect of such ruling on other issues in the litigation, except that the ruling must completely dispose of the issue of duty." (*Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 522 (*Linden Partners*).) In *Linden Partners,* the appellate court held that "it may fairly be concluded from settled authority and upon a reasonable interpretation of legislative intent that if, under the facts and circumstances of a given case, a court finds it appropriate to determine the existence or nonexistence of a duty in the nature of a contractual obligation, it may properly do so by a ruling on that issue presented by a motion for summary adjudication." (*Id.* at p. 519.)

Code of Civil Procedure, section 437c, subdivision (f)(1), allows summary adjudication of one or more issues of duty, so the fact that Moradzadeh's declaratory relief cause of action alleges several duties does not prevent the court from summarily adjudicating one issue of duty.

16

On appeal, the interpretation of a contract is subject to de novo review, unless extrinsic evidence is necessary to resolve any ambiguity or uncertainty. (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.) "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.,* § 1644), controls judicial interpretation. (*Id.,* § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.) The language of a contract must be interpreted as a whole, and courts will not strain to create ambiguity where none exists. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.)

We conclude that under the plain language of Article VIII, subdivision (f), of the CC&Rs, the Association owes its members a duty to enter into contracts or other arrangements for the maintenance and repair of slope areas located within the property adjacent to the development described in Exhibit A. The provision expressly states that maintenance and repair of the slopes located in Exhibit A is conducive to the purpose of the Association.

The Association contends Article VIII, subdivision (f), should be interpreted to mean maintenance of the slopes in Exhibit A is conducive to the purpose of the Association only if the slopes were added to the development project after the CC&Rs were filed. This limitation is not contained in the CC&Rs. The City required the developer to make arrangements for maintenance and repair of the adjoining slopes as a condition of approval of the project. The Association has an interest in the maintenance and repair of the adjoining slopes regardless of whether the property is included in the development because of the serious threat to the homes in the development from

17

concerns such as fire hazards and slope failure. The CC&Rs do not require the property in Exhibit A to be added for Article VII, subdivision (f) to apply.

The Association also contends the duty contained in Article VIII, subdivision (f) was void from the inception under Civil Code section 1608, because the substance of the contract was illegal, namely, requiring the Association to trespass on adjoining property. The CC&Rs do not require the Association to trespass on adjoining property to fulfill its duty. The Association has a duty to enter into contracts and other arrangements for maintenance and repair of the adjoining slopes. The provision does not require the Association to enter onto the adjoining property without permission. For example, the Association could negotiate an agreement to maintain the Exhibit A hillside with the property owner, or obtain an easement for maintenance from the property owner as the Share plaintiffs readily did.

The Association contends Moradzadeh's interpretation of the CC&Rs leads to absurd results. We disagree. The developer was allowed to build 42 homes with the express recognition that the adjoining hillside would require ongoing maintenance and repair. Thirty-three homes are directly affected by the conditions of the adjoining hillside, and the entire community is affected by fire hazards and the instability of neighboring homes in the development. The developer distributed the risk of the hillside development and the cost of maintenance among the entire community that benefitted from development of the property, rather than placing a more prohibitive burden on individual lots in the development. The CC&Rs require the Association to enter into agreements with the owner of the adjoining property, but the CC&Rs also allow for amendment by the members. On its face, Moradzadeh's interpretation of the Association's duty under the CC&Rs is not absurd.

With respect to the Association's cross-appeal, the trial court properly denied their motion for summary judgment on the issue of duty. The Association contends the provisions of the CC&Rs are unenforceable because they are unconscionable, impossible, lead to absurd results, and the burden is disproportionate to any benefit. Triable issues of fact exist as to the Association's defenses to enforcement of the CC&Rs and the

18

Association's reasonable efforts in good faith to comply with the duties set forth in the CC&Rs.

We need not consider the Association's contentions about evidentiary rulings, because we did not rely on any of the contested evidence in reaching the conclusions above.

## DISPOSITION

The judgment, the order granting summary judgment, and the order denying Moradzadeh's motion for summary adjudication are reversed. The trial court is directed to enter a new and different order denying the Association's motion for summary judgment which was based on the statute of limitations. The trial court is also directed to enter a new and different order granting Moradzadeh's motion for summary adjudication on the ground that the Association has a duty under Article VIII, subdivision (f), of the CC&Rs, to enter into contracts or other arrangements for the maintenance and repair of slope areas located within the property adjacent to the development described in Exhibit A. Moradzadeh is awarded his costs on appeal.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.                    KIRSCHNER, J. [*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.